F. & D. Rentals, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket No. 4723–62.   Filed June 9, 1965.

*James F. Thornburg* and *Frank P. Maggio*, for the petitioner.
*Howard K. Schwartz*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency of $98,540.50 in the petitioner's income tax for the fiscal year ended April 30, 1958.

The issues for decision are:

(1) What is the proper allocation of the lump-sum purchase price paid for the mixed aggregate of the operating assets of a going business which petitioner purchased? The precise income tax question involved concerns the computation of petitioner's cost of goods sold for the taxable year; and this requires a determination of what portion of said lump-sum purchase price should be allocated to the inventory which petitioner acquired.

(2) Is petitioner entitled to a claimed deduction for contributions to two employees' pension trusts, where it made no payment of such contributions by way of cash, check, promissory note, or other property, during the time specified in the controlling statutes (secs. 404 (a) (1) and (6), and 6072(b), 1954 Code)?

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts and the exhibits identified therein, are incorporated herein by reference.

The petitioner, F. & D. Rentals, Inc., is a corporation organized and existing under the laws of the State of Indiana. At the present time its office and principal place of business is in Chicago. It kept its books of account and filed its Federal income tax returns on an accrual basis of accounting and for fiscal years ending April 30. For the taxable year ending April 30, 1958, which is here involved, petitioner filed its Federal corporation income tax return with the district director of internal revenue at Indianapolis, Ind.

### Facts re Issue 1

Petitioner was organized in May 1957, under the name of the South Bend Toy Manufacturing Co., Inc., for the purpose of engaging in a business of manufacturing and selling toys. It will be sometimes hereinafter called South Bend Toy No. 2, in order to distinguish it from two other corporations involved in the instant case which bore the same name and which are hereinafter more fully described.

One of these other just-mentioned corporations, South Bend Toy Manufacturing Co. (hereinafter called South Bend Toy No. 1), was organized under Indiana law in 1882 for the purpose of engaging in a business of manufacturing toys. As of May 1957, the 54,750 shares of capital stock outstanding of South Bend Toy No. 1 were owned in principal part by the trustees of two trusts: (1) The National Bank & Trust Co. of South Bend, Successor Trustee of the Frederick H. Badet Trust (an inter vivos trust), 27,600 shares; and (2) The National Bank & Trust Co. of South Bend, Trustee of the Henry S. Badet Trust (a testamentary trust), 24,750 shares. Both of such trusts were ad-

ministered under the jurisdiction of the St. Joseph Superior Court No. 1, sitting at South Bend, Ind. The sole beneficiaries of each of said trusts at all times here pertinent, were: (1) Edna Badet, the widow of Henry S. Badet, Sr., and the mother of Barbara Banzhaf and Henry S. Badet, Jr.; (2) Henry S. Badet, Jr., and his sister Barbara Banzhaf; and (3) the respective descendants of Henry Badet, Jr., and Barbara Banzhaf.

After the year 1952, when Henry Badet, Jr., moved to Tucson, Ariz., none of the beneficiaries of either of the trusts took an active part in the management of the business of South Bend Toy No. 1. Sometime during the year 1953, the trustee-bank began to search for prospective purchasers of the business. Although it actively attempted to sell the toy business owned and operated by South Bend Toy No. 1, and conducted preliminary negotiations with several interested parties, no firm offer was received by the trustee-bank prior to March 15, 1957.

On the last-mentioned date, Benjamin F. Fohrman and John W. Dorgan, who were two Chicago attorneys who had engaged together in several prior business transactions, submitted a letter-offer to the trustee-bank to purchase the business then being operated by South Bend Toy No. 1. Said letter-offer stated, in here material part, as follows:

In connection with the acquisition by ourselves of The South Bend Toy Manufacturing Company, we have made a survey of the company and have come to the conclusion that the most desirable manner of acquiring said company is by purchase of its assets.

    *       *       *       *       *       *       *

We propose to buy all assets as disclosed on balance sheet dated December 31, 1956 excepting cash, government bonds and negotiable securities for a price of $300,000.00 less than the book value of said assets * * *.

    *       *       *       *       *       *       *

All accounts receivable acquired shall be guaranteed by sellers and after 150 days from date of closing all uncollected receivables shall be delivered to sellers and balance due thereon credited to buyers. * * *

    *       *       *       *       *       *       *

For the purposes of this offer, all matters concerned in the purchase have not been set forth in detail, but upon the entering into of a purchase and sale agreement by sellers and purchasers, all matters and details attendant thereto will be spelled out in full.

We think it important for the sellers to know that our methods of operation of South Bend Toy Manufacturing Company, after acquisition of its assets, would be to continue the present management and personnel and make only such changes as shall inure to the success and profit of the company.

At all times relevant, neither Fohrman nor Dorgan was related to, and each was independent of, South Bend Toy No. 1, the trustee-bank, and the beneficiaries of the two Badet trusts.

The trustee-bank accepted the offer of Fohrman and Dorgan; and on May 13, 1957, it filed a petition with the St. Joseph Superior Court No. 1, in which in substance it sought the court's approval for voting, as the majority stockholder, for South Bend Toy No. 1's consummating

the transaction proposed by Fohrman and Dorgan. The petition contained, *inter alia*, the following representations by the trustee-bank:

4. That certain of the beneficiaries of these trusts have been desirous and have importuned the Trustee and the life tenant, Edna P. Badet, to make a disposition, either through sale, liquidation or otherwise, of the shares of stock owned by these trusts and issued by said corporation in order to create a greater diversification of trust investment; that Edna P. Badet, the life tenant has agreed and subscribed to the proposed transaction hereinafter detailed and also the primary contingent beneficiaries, Henry S. Badet, Jr. and Barbara Badet Banzhaf, likewise have concurred in the transaction hereinafter detailed; that, accordingly, there appears a unanimity of opinion respecting the advisability of consummating the transaction related in this petition as among the beneficiaries of said trusts;

5. That The South Bend Toy Manufacturing Company has received a proposal from Messrs. Benjamin F. Fohrman and John W. Dorgan of Chicago, Illinois to purchase all assets of The South Bend Toy Manufacturing Company as the same shall exist on May 31, 1957, excepting and excluding from such sale cash on hand and in banks, refund claims for taxes, if any there be, federal, state and local, whether or not arising from the contemplated transaction; * * * that said prospective purchasers have offered to pay the "book value" of the assets to be purchased as such book value is determined by the auditors of the company to be as at May 31, 1957 in accord with the normal accounting procedures employed by such company auditors in computing the book value thereof, less the sum of Three Hundred Thousand Dollars ($300,000.00), * * *

6. That it is anticipated that such sale will result in a corporate loss of Three Hundred Thousand Dollars ($300,000.00) which, together with the seasonal net operating loss for the current fiscal year of the corporation, is likely to result in a federal net income tax refund to The South Bend Toy Manufacturing Company of approximately One Hundred Ninety-two Thousand One Hundred Dollars ($192,100.00), dependent upon variables, including the variable of the exact seasonal loss to date of closing; that, therefore, the net realization to be experienced by the corporation on account of the transaction would be approximately One Hundred Forty-four Thousand Dollars ($144,000.00) less than the book value of the net worth of the corporation as at December 31, 1956 in the amount of One Million Five Hundred Fifty-eight Thousand Six Hundred Seventy-six Dollars ($1,558,676.00) and accordingly that the net realization anticipated to the corporation from the transaction is likely to approximate One Million Four Hundred Fourteen Thousand Six Hundred Seventy-six Dollars ($1,414,-676.00), subject to Indiana gross income tax and costs incident to perfecting the transaction; that Messrs. Dorgan and Fohrman, as an incident to the transaction, have undertaken to enter into a certain contract with the shareholders of the corporation whereby they will guarantee such anticipated tax refunds, all in accord with and as detailed in a certain proposed contract entitled "Agreement" between Messrs. Dorgan and Fohrman, on the one hand, and Edna P. Badet, of South Bend, Indiana, Henry S. Badet, Jr., of Tucson, Arizona, Barbara Badet Banzhaf of Milwaukee, Wisconsin, * * * [and the trustee-bank] which proposed form of agreement, together with the proposed form of agreement between The South Bend Toy Manufacturing Company and Messrs. Dorgan and Fohrman, is herewith submitted to the court contemporaneously with the filing of this petition;

\*       \*       \*       \*       \*       \*       \*

8. That the purchasers are requiring that the Trustee, together with the principal stockholders, enter into a non-compete agreement with the purchasers in connection with The South Bend Toy Manufacturing Company business for a

period of five (5) years, for which Messrs. Dorgan and Fohrman have agreed in writing to pay to the Trustee of each of the trusts herein, on a quarterly basis the sum of Three Thousand Dollars ($3,000.00) per annum, or a total of Six Thousand Dollars ($6,000.00) per annum for the two trusts, which compensation your Trustee considers to be reasonable and adequate for such non-compete agreement;

On the same date of May 13, the St. Joseph Superior Court No. 1 entered an order which in substance and effect authorized the trustee-bank to vote in favor of consummating the transaction proposed by Fohrman and Dorgan and outlined in the trustee-bank's petition.

Subsequently, on May 22, 1957, the formal purchase and sale agreement contemplated in Fohrman and Dorgan's letter-offer of March 15, was entered into by and between South Bend Toy No. 1, as seller, and Fohrman and Dorgan, as buyers. This agreement provided, in substance and effect, that South Bend Toy No. 1 would sell to Fohrman and Dorgan, or to their nominee, all of the *operating* assets [1] of the former's business, at a purchase price equal to the "book value" of the assets, reduced by the sum of $300,000. All the assets to be sold were to be listed and priced, "with proper and appropriate agreed reductions therein to reflect said Three Hundred Thousand Dollars ($300,000.00) reduction in 'book value.'" In the event the parties were unable to agree to the proper allocation of the $300,000 reduction as among the several assets to be sold, it was provided that any disagreement was to be submitted to a neutral third party whose decision on the disagreement should be final and binding on both parties.

On May 24, 1957, the petitioner corporation was organized under the laws of the State of Indiana, with an authorized capital of $50,000 represented by 1,000 shares of the par value of $50 per share. Five hundred of such shares were issued to Fohrman, and 500 were issued to Dorgan. Petitioner's capitalization, and the ownership of its stock, remained unchanged during the year in issue.

The parties have stipulated that thereafter and prior to May 31, 1957 (the closing date specified in the above agreement), Fohrman and Dorgan transferred and assigned to petitioner, as their nominee, all of their right, title, and interest in, to, and under the said agreement, in a transaction to which section 351 of the 1954 Code [2] was applicable.

---

[1] Par. 1 of sec. C of the purchase and sale agreement provided as follows with respect to the assets to be sold to buyers:

\* \* \* all assets of the Seller as they shall exist as at the "closing date", as hereinafter set forth, excepting and excluding from such sale only the following assets of the Seller as at the "closing date", viz., cash on hand and in banks; refund claims for taxes, if any there be, federal, state and local, whether or not arising from this contemplated transaction; other rights, claims or choses in action of any nature not disclosed by the statement of financial condition on Exhibit "A"; any and all rights arising from or undertaken by this agreement or any instrument to be executed pursuant hereto in favor of Seller; and government or private securities and any interest or dividends thereon.

[2] Sec. 351 of the 1954 Code provides, in substance, that no gain or loss shall be recognized if property is transferred to a corporation in exchange for stock, and immediately after the exchange the transferors are in control of the corporation.

The balance sheet of South Bend Toy No. 1, as of the May 31, 1957, closing date, was as follows:

*The South Bend Toy Manufacturing Co., South Bend, Ind.*

BALANCE SHEET, May 31, 1957

ASSETS

*Current assets*

| | | |
|---|---:|---:|
| Cash on hand and in bank | | $151, 363. 49 |
| Accounts receivable: | | |
| Trade | $251, 513, 96 | |
| Employees | 139. 21 | |
| Miscellaneous | 407. 22 | |
| | | 252, 060. 39 |
| Claim for refund—Federal income tax | | 43, 026. 96 |
| Inventories: | | |
| Raw material | 353, 677. 93 | |
| Work in process | 111, 687. 77 | |
| Finished goods | 324, 986. 69 | |
| Factory supplies | 2, 352. 03 | |
| Fuel | 5, 607. 00 | |
| | | 798, 311. 42 |
| Advances for material | | 29, 014. 83 |
| Prepaid insurance | | 15, 240. 38 |
| Total current assets | | $1, 289, 017. 47 |

| Fixed Assets | Cost | Accumulated depreciation | Net book value |
|---|---:|---:|---:|
| Land | $33, 645, 93 | 0 | $33, 645. 93 |
| Buildings | 271, 458. 35 | $118, 688. 34 | 152, 770. 01 |
| Elevated railroad siding | 14, 423. 00 | 4, 200. 74 | 10, 222. 26 |
| Driveway and parking lot | 4, 572. 28 | 1, 885. 97 | 2, 686. 31 |
| Machinery and equipment | 468, 797. 15 | 210, 393. 80 | 258, 403. 35 |
| Office furniture and fixtures | 10, 267. 51 | 3, 327. 46 | 6, 940. 05 |
| Office machines | 15, 590. 85 | 8, 989. 54 | 6, 601. 31 |
| Truck and tractor | 4, 362. 38 | 3, 481. 51 | 880. 87 |
| Factory trucks | 2, 173. 87 | 745. 70 | 1, 428. 17 |
| Construction in process | 1, 609. 31 | 0 | 1, 609. 31 |
| Totals | 826, 900. 63 | 351, 713. 06 | 475, 187. 57 |

| | | |
|---|---:|---:|
| Other assets and deferred charges: | | |
| Airline deposits | 425. 00 | |
| Miscellaneous deferred charges | 2, 438. 14 | 2, 863. 14 |
| Total assets | | 1, 767, 068. 18 |

The *South Bend Toy Manufacturing Co., South Bend, Ind.*—Continued
BALANCE SHEET, May 31, 1957—Continued

LIABILITIES AND CAPITAL

*Current liabilities*

Employees' funds withheld:

| | | | |
|---|---|---|---|
| Federal income tax | $12, 799. 00 | | |
| Federal insurance contribution | 2, 088. 90 | | |
| Miscellaneous | 608. 89 | | |
| | | $15, 496. 79 | |
| Accounts payable | | 79, 804. 88 | |
| Accruals: | | | |
| Salaries, wages, and commissions | 21, 772. 91 | | |
| Insurance | 4, 468. 45 | | |
| Taxes: | | | |
| Federal income— | | | |
| 1956 | $46, 000. 00 | | |
| Federal unemployment compensation | 1, 038. 69 | | |
| Federal insurance contribution | 2, 088. 90 | | |
| Federal excise—manufacturers | 9, 406. 84 | | |
| Indiana unemployment compensation | 4, 316. 86 | | |
| Indiana gross income | 29. 10 | | |
| Local property | 18, 896. 04 | 81, 776. 43 | |
| | | 108, 017. 79 | |
| Provision for vacation and holiday pay | | 27, 616. 51 | |
| Provision for contribution to pension fund | | 17, 500. 00 | |
| Total current liabilities | | | $248, 435. 97 |

*Capital*

| | | |
|---|---|---|
| Common stock—$10 par value; authorized 100,000 shares; issued and outstanding 54,750 shares | 547, 500. 00 | |
| Retained earnings | 971, 132. 21 | |
| | | 1, 518, 632. 21 |
| Total liabilities and capital | | 1, 767, 068. 18 |

Those assets belonging to South Bend Toy No. 1 which were to be sold and transferred to the petitioner, had a book value as of May 31, 1957, of $1,576,179.57. In accordance with the above-mentioned agreement of May 22, that the buyers were to pay $300,000 less than the book value of said assets, the total purchase price to be paid by Fohrman and Dorgan or their nominee under said agreement was $1,276,179.57. At a time not shown with certainty by the evidence herein, Fohrman and Dorgan made an allocation of the last-mentioned amount among the assets being sold by South Bend Toy No. 1.

The trustee-bank, as the majority shareholder of South Bend Toy No. 1, agreed to this allocation in order to meet the terms of the purchaser. If the trustee-bank had not so agreed, it would have been unable to effect the sale to petitioner. The following tables shows the book value of the assets as carried on the books of South Bend Toy No. 1; the allocation made by Fohrman and Dorgan of the "reduced" purchase price to and among said assets; and the reduction, if any, from book value for the various groups of assets:

| | (1) Value per books of South Bend Toy No. 1 | (2) Allocation of "reduced" purchase price by Fohrman and Dorgan | (3) Reduction, if any, from book value |
|---|---|---|---|
| **CURRENT ASSETS** | | | |
| Petty cash | $750.00 | $750.00 | 0 |
| Cash in bank | 100.00 | 100.00 | 0 |
| Accounts receivable | 252,060.39 | 252,060.39 | 0 |
| Advances for material | 29,014.83 | 29,014.83 | 0 |
| Prepaid insurance | 15,240.38 | 15,240.38 | 0 |
| Airline deposit | 425.00 | 425.00 | 0 |
| Total current assets | 297,590.60 | 297,590.60 | 0 |
| **INVENTORY** | | | |
| Raw materials | 353,677.93 | 353,677.93 | 0 |
| Work in process | 111,687.77 | 111,687.77 | 0 |
| Finished goods | 324,986.69 | 324,986.69 | 0 |
| Total inventory | 790,352.39 | 790,352.39 | 0 |
| **DEFERRED CHARGES** | | | |
| Factory supplies | 5,003.87 | 5,003.87 | 0 |
| Fuel | 5,607.00 | 5,607.00 | 0 |
| Miscellaneous deferred charges | 2,438.14 | 2,438.14 | 0 |
| Total deferred charges | 13,049.01 | 13,049.01 | 0 |
| **FIXED ASSETS** | | | |
| Land | 33,645.93 | 11,817.18 | $21,828.75 |
| Building (net) | 152,770.01 | 56,524.90 | 96,245.11 |
| Railway siding (net) | 10,222.26 | 3,782.24 | 6,440.02 |
| Driveway and parking lot (net) | 2,686.31 | 993.93 | 1,692.38 |
| Machinery and equipment (net) | 258,403.35 | 95,609.24 | 162,794.11 |
| Office furniture and fixtures (net) | 6,940.05 | 2,567.82 | 4,372.23 |
| Office machines (net) | 6,601.31 | 2,442.48 | 4,158.83 |
| Truck-tractor (net) | 880.87 | 325.92 | 554.95 |
| Factory trucks (net) | 1,428.17 | 528.42 | 899.75 |
| Construction in process | 1,609.31 | 595.44 | 1,013.87 |
| Total fixed assets | 475,187.57 | 175,187.57 | 300,000.00 |
| Total assets | 1,576,179.57 | 1,276,179.57 | |

The trustee-bank as the principal stockholder of the seller corporation, realized that a sale of South Bend Toy No. 1's assets at less than their book value would produce a loss which would form part of a net operating loss for the year of sale that could be carried back and made the basis of a refund of Federal income taxes for prior years, regardless of which assets were sold for a consideration less than their book value. The only additional advantage inuring to the seller as a result of allocating all of the reduction from book value to fixed assets, as opposed to allocating such reduction in part to inventory

and in part to fixed assets, was a comparatively small saving of $1,400 in Indiana gross receipts taxes. The loss sustained by the seller as the result of selling its assets at less than book value was substantially allowed by the respondent; and South Bend Toy No. 1 eventually received a refund of prior years' income taxes of approximately $190,000.

On or about May 24, 1957, in accordance with the agreement dated May 22, South Bend Toy No. 1 changed its name to Badet, Inc. Badet, Inc., did not engage in the manufacture or sale of toys at any time subsequent to June 1957, but rather became an investment company.

Beginning on or about June 1, 1957, petitioner began carrying on the toy business which had previously been operated by South Bend Toy No. 1.

About 8 months later, on February 1, 1958, Fohrman and Dorgan entered into an agreement with two individuals by which a new corporation would be formed under Indiana law to operate the toy manufacturing and selling business then carried on by petitioner. The contemplated new corporation was organized on February 1, 1958, and it was named South Bend Toy Manufacturing Co., Inc. (hereinafter called South Bend Toy No. 3). South Bend Toy No. 3 leased from petitioner all of the machinery and fixed assets that the petitioner had purchased from South Bend Toy No. 1. Also on February 1, 1958, the petitioner's name was changed to its present form.

On its return for the taxable year ended April 30, 1958, which is here involved, petitioner computed its cost of goods sold, utilizing as the cost of its opening inventories the amounts which Fohrman and Dorgan had allocated thereto (i.e., the *same amounts as South Bend Toy No. 1's book values* for such inventories). In addition, petitioner computed its depreciation deduction, utilizing as its cost basis for its depreciable assets, the amounts which Fohrman and Dorgan had allocated thereto (i.e., for the aggregate of the fixed assets (land and depreciable assets), an amount which was *$300,000 less than South Bend Toy No. 1's book values* for said assets).

In his statutory notice of deficiency, respondent determined that the allocation made by Fohrman and Dorgan of the total purchase price, as regards inventory and land and fixed assets, was not in accord with their relative values. Accordingly, respondent made his own independent allocation, in which he reduced the cost basis of petitioner's opening inventory by $186,959.93 (thereby increasing petitioner's gross income in a like amount); and as a complement, he increased the cost basis of land and fixed assets (thereby increasing the depreciation deduction to which petitioner is entitled).

The following table shows a comparison between the allocation made by Fohrman and Dorgan, and that made by the respondent:

| | Allocation by Fohrman by Dorgan | Allocation by respondent |
|---|---|---|
| **CURRENT ASSETS** | | |
| Petty cash | $750.00 | $750.00 |
| Cash in bank | 100.00 | 100.00 |
| Accounts receivable | 252,060.39 | 252,060.39 |
| Advances for material | 29,014.83 | 29,014.83 |
| Prepaid insurance | 15,240.38 | 15,240.38 |
| Airline deposit | 425.00 | 425.00 |
| Total current assets | 297,590.60 | 297,590.60 |
| **INVENTORY** | | |
| Raw materials | 353,677.93 | 270,014.48 |
| Work in process | 111,687.77 | 85,267.74 |
| Finished goods | 324,986.69 | 248,110.24 |
| Total inventory | 790,352.39 | 603,392.46 |
| **DEFERRED CHARGES** | | |
| Factory supplies | 5,003.87 | 5,003.87 |
| Fuel | 5,607.00 | 5,607.00 |
| Miscellaneous deferred charges | 2,438.14 | 2,438.14 |
| Total deferred charges | 13,049.01 | 13,049.01 |
| **FIXED ASSETS** | | |
| Land | 11,817.18 | 25,686.90 |
| Building (net) | 56,524.90 | 116,631.86 |
| Railway siding (net) | 3,782.24 | 7,804.16 |
| Driveway and parking lot (net) | 993.93 | 2,050.85 |
| Machinery and equipment (net) | 95,609.24 | 197,277.36 |
| Office furniture and fixtures (net) | 2,567.82 | 5,298.36 |
| Office machines (net) | 2,442.28 | 5,039.74 |
| Truck-tractor (net) | 325.92 | 672.50 |
| Factory trucks (net) | 528.42 | 1,090.33 |
| Construction in process | 595.44 | 595.44 |
| | 175,187.57 | 362,147.50 |

### OPINION RE ISSUE 1

We must decide under this first issue whether the petitioner has sustained its burden of establishing error in the respondent's allocation of the lump-sum purchase price paid by petitioner for the operating assets of the going business of South Bend Toy No. 1, among those assets.

Petitioner initially argues that the allocation made by Fohrman and Dorgan on petitioner's behalf, which allocation was agreed to by the seller, was a contractual arrangement between parties dealing at arm's length that is final and binding and conclusive upon the parties thereto and the respondent as well. We agree that the aggregate purchase price was arrived at by negotiation between independent parties with adverse interests. But, as regards the allocation of that aggregate purchase price among the several assets purchased, the following testimony given by Roland Goheen, the trust officer of the trustee-bank, a director of South Bend Toy No. 1, and the individual representing said seller corporation in the negotiations with Fohrman and

Dorgan, is persuasive evidence that the allocation was in actuality the unilateral determination of Fohrman and Dorgan:

Q. Mr. Goheen, in regard to the column two allocation on Exhibit 18-R [being the allocation contended for by petitioner in the instant case], would you please explain to the Court what financial interest the seller had in agreeing to the allocation?

A. The seller received an offer from Messrs. Dorgan and Fohrman. *Included in the offer was a stipulation that we agree to the allocation of the discount to specific assets. If we had not agreed, we would have had no sale.*

Q. Is it correct to say that this was made to meet the terms of your purchaser?

A. Right.

Q. * * * did it make any financial difference to the seller, other than to meet the terms of his purchaser, did it make any financial difference how the amounts are allocated?

A. Not insofar as the seller was concerned, no.

[Emphasis supplied.]

Moreover, it is now well settled that the Commissioner is not bound to accept an artificial and unrealistic allocation of a lump-sum purchase price made by the seller and purchaser; rather, the Commissioner may in such circumstances make an independent allocation of his own, assigning portions of the aggregate purchase price to individual assets or groups of assets in accordance with their relative values and in accordance with the realities of the transaction. *Kunz* v. *Commissioner*, 333 F. 2d 556 (C.A. 6), affirming a Memorandum Opinion of this Court; *Copperhead Coal Co.* v. *Commissioner*, 272 F. 2d 45 (C.A. 6), affirming a Memorandum Opinion of this Court; *Hamlin's Trust* v. *Commissioner*, 209 F. 2d 761 (C.A. 10), affirming 19 T.C. 718; *Sidney V. LeVine*, 24 T.C. 147; *C. D. Johnson Lumber Corp.*, 12 T.C. 348. See also Income Tax Regs., sec. 1.61-6 and sec. 1.167(a)-5.

We think that Fohrman and Dorgan's allocation was artificial and unrealistic in at least one important and significant respect. In their allocation, they have treated (we think primarily to serve petitioner's interests for Federal income tax purposes) the inventory acquired as the *equivalent of cash*, by allocating a portion of the lump-sum purchase price thereto, equal to the seller's book value. This is the same way that Fohrman and Dorgan treated such items as cash, guaranteed accounts receivable, and prepaid expenses. The seller's inventory was composed of three elements—raw materials, work in process, and finished goods—all having an aggregate book value to South Bend Toy No. 1 of $790,352.39. Of that total, $353,677.93 was raw materials to be used in the manufacture of toys and on which no work had been performed; $111,687.77 of said total represented work in process, partially completed toy products that had varying degrees of additional work to be performed thereon before they could become finished products ready for sale in the ordinary course of business; and only

$324,986.69 of such total represented finished goods, ready for sale in the ordinary course of business. Even as to these articles of finished goods, it would be necessary to incur further costs in selling and shipping the same. We are not at all convinced that a realistic allocation would have accorded these categories of inventory the same dollar-for-dollar values, equal to the seller's book values, such as was done in the case of the cash and the guaranteed accounts receivable, prepaid expenses, and the like.

We therefore hold that the respondent, in the instant case, could properly disregard the Fohrman and Dorgan allocation and proceed to make one of his own.

In our opinion, after a consideration and weighing of all the evidence on the point, we have concluded that petitioner has not established error in the allocation which formed the basis of the respondent's determination in the instant case.

It is now established that where a taxpayer purchases a mixed aggregate of assets for one lump-sum purchase price, said lump-sum purchase price must be fragmented, and the resultant portions thereof assigned to the several assets, or groups or classes of assets, that went to make up the aggregate purchased. In this connection, this Court stated in the *C. D. Johnson Lumber* case, "if the total consideration is paid for a mixed aggregate of assets, its allocation among the several properties acquired should be based upon the relative values of each item to the value of the whole. Cf. *Nathan Blum*, 5 T.C. 702; *Clifford Hemphill*, 25 B.T.A. 1351." The allocation called for by the rule in the *Johnson* case requires that the fair market value of each item of the aggregate be established, and then that the proportion which the fair market value of each item bears to the total fair market value of the aggregate be applied to the lump-sum purchase price, to fix the portion of the lump-sum price to be allocated to each particular item. Thus, assume that the mixed aggregate consisted of items A, B, C, and D, having fair market values of $30,000, $15,000, $10,000, and $5,000, respectively, and that this mixed aggregate had been purchased for $50,000. The total fair market value would be $60,000. The portion of the lump-sum purchase price to be applied to item A, for example, would be $\frac{\$30,000}{\$60,000} \times \$50,000$, or $25,000.

Bearing these principles in mind, we turn to the facts of the instant case. Petitioner did introduce evidence as to the fair market value of the land and certain depreciable assets acquired by it from South Bend Toy No. 1. Such fair market values are, it is to be noted, out of line with the amounts assigned to the said items by Fohrman and Dorgan, in their allocation. But, more significantly, petitioner did not produce evidence as to the *fair market value* of any of the three

elements of inventory—raw materials, work in process, and finished goods. Petitioner's evidence on this aspect of the case was no more than an attempt to justify Fohrman's and Dorgan's allocation to inventory, which in effect treated the inventory as the *equivalent of money in the bank*. That, as we have already said, is an unsound position; and the evidence on which such position is predicated does not, in our opinion, constitute proof of the *fair market value* of the inventory. Inventory, book-value-wise, was the largest group of assets acquired by petitioner from South Bend Toy No. 1. In the absence of evidence as to its fair market value, the method of allocation presented in the *C. D. Johnson Lumber* case, *supra*, cannot be applied in the instant case.

In the light of petitioner's unsuccessful efforts to sustain the allocation made by Fohrman and Dorgan or to establish an alternative thereto based upon relative fair market values, we are left with the allocation made by the respondent. Said allocation is presumptively correct; appears reasonable on its face; and appears also to be in line with the method which the Commissioner employed and this Court approved in *Nathan Blum*, 5 T.C. 702. We accordingly approve the Commissioner's allocation in the absence of competent evidence that it is erroneous.

We decide this first issue for the respondent.

### Facts re Issue 2

All of the facts respecting this issue were stipulated. Such facts are summarized as follows.

In connection with petitioner's transaction with South Bend Toy No. 1, petitioner became obligated to acquire and assume the burden of two pension plans: (1) A pension plan for factory employees paid on an hourly basis; and (2) a plan covering salaried employees. Both plans were approved by the respondent; and at all times said plans qualified under existing internal revenue laws. The liabilities assumed by petitioner relative to said pension plans, were as follows:

| | |
|---|---|
| Pension plan for factory employees | $5,000 |
| Pension plan for salaried employees | 12,500 |
| Total | 17,500 |

On its Federal income tax return for the year ended April 30, 1958, which is here involved, petitioner claimed a deduction in the amount of $24,500 (presumably including the above-mentioned $17,500), representing an accrual on its books for contributions to pension plans. Petitioner did not pay any of this amount during the taxable year either by cash or by check or by note or by any other property; but petitioner did make a payment of $10,816.18 to the plan for factory

employees on October 23, 1958, approximately 6 months after the close of the taxable year here involved.

The respondent, upon audit, disallowed the claimed deduction.

OPINION RE ISSUE 2

Section 404 (a) of the 1954 Code provides, insofar as is here material, as follows:

SEC. 404   DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, * * * such contributions * * * shall not be deductible under section 162 * * * or section 212 * * * but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

   (1) PENSION TRUSTS.—In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 501 (a), * * *

           *          *          *          *          *          *          *

   (6) TAXPAYERS ON ACCRUAL BASIS.—For purposes of paragraph (1) * * * a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).

Section 6072 (b) provides that returns of corporations using a fiscal year shall be filed on or before the 15th day of the third month following the close of the fiscal year. Petitioner actually filed its return on July 15, 1958, which was the due date for filing the same.

In order for petitioner to be entitled to the deduction here in issue, it would be necessary, under the statutes just quoted, for it to have made payment to the pension trusts on or before July 15, 1958 (the 15th day of the third month following the close of its taxable fiscal year ended April 30, 1958). Petitioner made no payment by cash or by check or by note or by any other property within such prescribed time.

Petitioner's primary contention is that its assumption of the obligation from South Bend Toy No. 1 to make contributions to the pension plans, was "analogous to a promissory note and the date on which said * * * obligation was incurred should be recognized as the date of Petitioner's payment."

There is, in our opinion, no merit to petitioner's primary contention. We believe that petitioner's agreement with South Bend Toy No. 1 to step into the latter's shoes insofar as these pension plans are concerned, is not the equivalent of the statutory requirement of *payment*.

While we have held that a contribution to a pension trust could be made by a conveyance of real estate (*Colorado National Bank of Denver*, 30 T.C. 933) and while the Court of Appeals for the Tenth Circuit has held that the payment requirement is satisfied by the employer's delivering *to the pension plan trustee* of the employer's unsecured promissory note (*Wasatch Chemical Co.* v. *Commissioner*, 313 F. 2d 843, reversing 37 T.C. 817), we have found no authority to support petitioner's primary contention, that an agreement with some other party than the trustee to whom payment is due, constitutes payment to the trustee. The statutory scheme, it seems clear enough, requires that an accrual basis taxpayer part with something of value to the pension plan trustee. Petitioner did not part with anything during the required time. It only accrued an obligation on its books. And that is not enough.

As an alternative to its primary contention, petitioner argues that it should be allowed to increase the cost basis of the assets it acquired from South Bend Toy No. 1, by adding thereto the amount of its unpaid obligations to the pension plans. The ultimate effect of this procedure would be to permit petitioner to deduct, by way of depreciation deductions or as part of its cost of goods sold, the very amounts which it cannot deduct directly (because of its tardy payment) under the *only* statutory authority for deductions for contributions to pension plans—section 404. We will not sanction this bypassing of the statute. Deductions are a matter of legislative grace. *New Colonial Ice Co.* v. *Helvering*, 292 U.S. 435. Congress spelled out quite clearly what accrual basis taxpayers must do in order to get deductions for payments to pension plans. Petitioner did not fulfill the requirements imposed by Congress; and it cannot have the deduction, either directly or by way of the indirect route embraced in its alternative contention.

We decide the second issue for the respondent.

*Decision will be entered for the respondent.*