Blackstone Realty Company, Inc. v. Commissioner.
Blackstone Realty Co. v. Commissioner
Docket No. 5060-63.
United States Tax Court
T.C. Memo 1966-156; 1966 Tax Ct. Memo LEXIS 125; 25 T.C.M. (CCH) 826; T.C.M. (RIA) 66156; June 30, 1966
*125 Held, that the petitioner has not shown error in the respondent's determination that it received in excess of 30% of the selling price of a lease in the taxable year of the sale and that therefore it may not report the gain from the sale on the installment method set forth in section 453 of the Internal Revenue Code of 1954. Roland J. Mestayer, Jr., and Vincent F. Kilborn, for petitioner. Robert G. Faircloth, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined an income tax deficiency for the taxable year ended May 31, 1961, in the amount of $43,684.93. The parties having reached agreement as to some of the issues and the petitioner having abandoned others, the only issue remaining for *126 decision is whether the petitioner is entitled to report the gain derived from the sale of a leasehold upon the installment method. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner is an Alabama corporation with its principal office at Mobile, Alabama. It was organized in 1958 by Manuel Vellianitis and his wife Penelope, who own all of its outstanding stock consisting of 200 shares having a par value of $10 per share. Its Federal income tax return for the taxable year ended May 31, 1961, was filed with the district director of internal revenue at Birmingham, Alabama. Petitioner's principal business activity is real estate rentals. On April 5, 1949, Manuel Vellianitis as lessee entered into a lease agreement with Helen R. Meaher, trustee under a trust created by Augustine Meaher, [1] for the rental of a 4-story brick office building known as the Greystone Building (sometimes referred to as the Meaher Building), located in the downtown commercial section of Mobile, Alabama. The lease was to run for a continuous term from November 1, 1949 to October 31, 1960, with provisions granting the lessee the option to renew *127 the lease for two additional 10-year terms. The rental was fixed at $750 per month for the period November 1, 1949, to October 31, 1950, and $1,500 per month for the remainder of the term, including extensions. The first floor of the building was air conditioned, but the second, third, and fourth floors were not. In order to rent such upper floors it was necessary to air condition them. Accordingly, on February 17, 1950, Vellianitis and Helen R. Meaher, as trustee, entered into a further lease agreement whereby the lessor rented to the lessee, for a term ending October 31, 1960 (with automatic renewals corresponding to the renewals provided in the lease of April 5, 1949), certain property to be installed in the Meaher Building, described as follows: Complete air-conditioning equipment and installation for the Second, Third and Fourth floors of the Meaher building, consisting of but without limitation to - One U.S. Airco *128 Model RK 20, 20 ton air-conditioning unit consisting of compressor, wealhermaker, and evaporative condenser. Two U.S. Airco Model RK 15, 15 ton air-condition units complete with compressor, weathermaker units, filters, evaporative condenser, electric motors, magnetic starters and automatic temperature controls. Complete air duct system to Second, Third and Fourth Floors of Meaher Building. The lessee agreed to pay as rental for the above-described air conditioning property a total of $18,000, payable $500 per month commencing June 1, 1950. The lease also contained the following provisions: It is understood and agreed that all of the installations to be made in said building pursuant to this lease shall immediately upon installation become a part of said building, and shall be and always remain the property of the lessor, it being understood however, that if the lessee fully complies with all of the terms of this lease and pays to the lessor all amounts due the lessor hereunder, at the times herein specified to be paid, upon receipt in full of all of said amounts, the following machinery, to-wit: One U.S. Airco Model RK 20, 20 ton air-conditioning unit consisting of compressor, *129 weathermaker, and evaporative condenser. Two U.S. Airco Model RK 15, 15 ton air-[conditioning] units complete with compressor, weathermaker units, filters, evaporative condenser, electric motors, magnetic starters and automatic temperature controls. shall, at the time of the making of the final payment become the property of the lessee subject only to the landlord's lien retained by the lessor in that certain lease of the Meaher Building dated April 5th, 1949, hereinabove more particularly referred to. * * *
The lessee hereby agrees and binds himself to keep repaired all of the said leased property and any addition or substitution thereto so that the same shall remain in good working condition and upon termination of the lease shall deliver said property, (excepting only the herein described machinery, the title to which shall have become vested in the lessee as hereinabove provided) to the lessor in substantially the same condition it was at the time of the execution of this lease, natural wear and tear accepted. The money necessary to finance the above air conditioning was furnished by Helen R. Meaher (presumably as trustee). Thereupon an air conditioning system was *130 installed which included 3 large air conditioning compressor units (which were installed on wood mountings in an alley adjacent to the building), duct work, and the necessary electrical wiring. There were also installed 20 to 25 window units to supplement the main system in the three top floors. In 1958, soon after the petitioner was organized by Manuel Vellianitis and his wife, it entered into a lease and agreement with the Meaher estate for the lease of the Greystone Building for a 10-year term, with the option to renew the lease for 4 additional terms of 10 years each, for a rental of $1,500 per month. Therein it was agreed that the lease of April 5, 1949, was terminated and that in lieu of making certain repairs required of Vellianitis by the old lease the petitioner would make certain capital improvements to the building. Such agreement contained the following provision in regard thereto: TWENTY-THREE The lessee does hereby agree and bind himself to promptly make and pay for certain repairs and improvements to the leased premises which shall include, but without limitation, the installation of at least one new elevator, and the necessary electrical work, plastering and *131 redecorating that will be necessary as the result of the installation of such new elevator. The lessee agrees to pay the entire cost of all of such repairs and improvements, and further agrees that all of the repairs and improvements, and necessary equipment shall be and remain the sole property of the lessors to be a part of the leasehold premises and covered by the terms of this lease. In order to aid the lessee in the financing of said work the lessors do hereby loan to the lessee the sum of Twenty-five Thousand and no/100 ($25,000.00) Dollars, cash, receipt of which is hereby acknowledged, which said indebtedness is represented by promissory note of even date herewith payable to the lessors at The First National Bank of Mobile, and which said indebtedness is secured in and by this lease. * * * The improvements made by petitioner in accordance with the above lease consisted of the extensive remodeling of one elevator, the changing of the type of electric current on both of the building's elevators, and the installation of new electrical wiring (the latter work being done in compliance with the requirements of a local building inspector). In addition to the above improvements *132 the petitioner installed wood paneling which cost approximately $15,000 and which was attached by screws to the walls of most of the rooms and halls in the building, and some light fixtures. The petitioner spent all the money advanced by the lessor and some of its own money. In 1959 petitioner employed Max Goldberg, a real estate broker, to find a purchaser of its leasehold interest in the Greystone Building and whatever interest it had in the leasehold improvements. Goldberg contacted D. R. Coley, Jr., who was chairman of the board of directors of the First Federal Savings and Loan Association of Mobile, Alabama (hereinafter referred to as First Federal), and its attorney. [2] First Federal had been in existence approximately 35 years and had a net worth of approximately 50 to 60 million dollars at that time. *133 Vellianitis and Goldberg, on behalf of the petitioner, carried on negotiations with Coley, acting on behalf of First Federal, with respect to the transfer of the lease to First Federal. During such negotiations the petitioner's representatives indicated that the petitioner was the owner of certain leasehold improvements and insisted upon a separate payment of $100,000 therefor, and a separate consideration for the leasehold interest consisting of monthly payments over a term of years. Various proposals and counter proposals were submitted. On March 15, 1960, First Federal made an offer, which was accepted by petitioner, which was as follows: The First Federal Savings & Loan Association of Mobile, makes your corporation a firm offer for its lease with the Meaher Estate on the property at the Northeast corner of St. Joseph and St. Michael Streets in the City of Mobile, known as the Greystone Building, together with all of its rights under said lease, as follows: $100,000.00 cash to be allocated to the cost of fixtures, equipment, air-conditioning, elevator, etc., installed by Blackstone Realty Company, Inc., in the building; $1,000.00 per month for a period of twenty years, or *134 a total of 240 months, the first payment to be due and payable thirty days from the closing of the transaction. * * *
In the event the Greystone Building is demolished within five years by the First Federal Savings & Loan Association, and you should desire at such time to undertake to demolish it, any offer submitted by you to effect demolition of it will be given preference. * * *
This offer is made on condition that the First Federal Savings & Loan Association is able to secure satisfactory agreement with the Meaher Estate for renewal and extension of the existing lease on the premises for a period which, with the existing lease, will aggregate not less than ninety-nine years * * *. There is tendered with this offer as earnest money check in the amount of $25,000.00 payable to Sam Pipes, III, with the understanding that in the event the First Federal Savings & Loan Association should fail to close the transaction in accordance with the provisions hereof for any fault of its own, then said earnest money shall be delivered to Blackstone Realty Company as liquidated damages, otherwise upon closing the trade, to be credited as a part of the cash payment provided for. *135 It is understood that the First Federal Savings & Loan Association will promptly undertake to make satisfactory agreements with the Meaher Estate * * * provided further that if satisfactory arrangements cannot be concluded within thirty days then this offer shall at the option of either party become void. First Federal was unable to reach an agreement with the Meaher estate at that time, and the $25,000 earnest money was returned to First Federal. Later, however, First Federal did enter into an oral agreement with the Meaher estate whereby such estate would extend the term of the lease. Thereupon, on July 1, 1960, the petitioner, as party of the first part, and First Federal, as party of the second part, entered an agreement referred to as a "LEASE and AGREEMENT", with respect to the petitioner's leasehold interest in the Greystone Building and whatever interest it had in leasehold improvements, which provided in part as follows: WHEREAS, the Party of the First Part has made certain improvements on the said leased property and owns certain fixtures and equipment situated thereon and used in connection therewith; and WHEREAS, Party of the Second Part desires to acquire all of *136 the rights and interests of the Party of the First Part in and to said property under said lease, and all rights and privileges granted to the Party of the First Part under the provisions of said lease; and desires to acquire the fixtures and equipment owned by the Party of the First Part in connection therewith as aforesaid; NOW THEREFORE, in consideration of the premises and of the sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) in cash, the receipt whereof is hereby acknowledged, and in further consideration of the payment by the Party of the Second Part to the Party of the First Part of the sum of ONE THOUSAND DOLLARS ($1,000.00) per month for a total of two hundred and forty consecutive months, beginning on the 1st day of August, 1960, without interest, and in further consideration of the assumption by the Party of the Second Part of all duties and obligations imposed upon the Party of the First Part by the terms of the lease aforesaid * * * the Party of the First Part has and does by these presents SELL, ASSIGN, TRANSFER and SET-OVER and CONVEY unto the Party of the Second Part all of that certain personal property owned by the Party of the First Part and situated on the *137 premises, and the apparatus, fixtures and equipment owned by the Party of the First Part, located on and/or used in connection with the operation of the premises, and all of its right, title and interest in and to that certain lease * * * and to the real property described therein, including all rights of renewal and every other right or privilege vested in it which it has by virtue of said lease or otherwise. The above agreement made no reference to the offer of March 15, 1960. The First Federal paid the petitioner $100,000 in cash in the taxable year ended May 31, 1960, and during such year paid the petitioner ten $1,000 monthly payments. From the proceeds the Meaher estate was then paid the remaining balance of the amount which it had advanced for the making of improvements to the leasehold premises. Although the agreement of July 1, 1960, between the petitioner and First Federal recited the transfer to First Federal by petitioner of all personal property owned by the petitioner and the apparatus, fixtures and equipment owned by the petitioner located on and used in connection with the operation of the premises, First Federal actually was not interested in obtaining any of *138 such property. Coley did not have an appraisal made of any such property which the petitioner or Vellianitis might have owned, and in the negotiations with petitioner was not interested in Vellianitis's valuation thereof. First Federal was interested in the location and in obtaining the leasehold. It was its purpose to use the existing building if it could be remodeled to suit its purposes; otherwise to demolish the building. First Federal found that the building could be adequately remodeled and in fact it was extensively remodeled. It installed a different type of air conditioning and did not use the air conditioning compressor units which had previously been installed by Vellianitis. Nor did it use in the building the window air conditioners which Vellianitis had installed, but disposed of them in a manner not disclosed by the record. It did use a considerable portion of the paneling which had previously been installed by the petitioner. On its books First Federal set up the $100,000 cash payment as an asset (prepaid lease expense), and amortized it over a 47 1/2 year period. On its books it treated the $1,000 monthly payments as rental. It did not set up on its books any account *139 with respect to any fixtures or improvements obtained under the agreement of July 1, 1960. In 1961 the petitioner borrowed $100,000 from an insurance company and agreed to repay this indebtedness at a rate of $1,000 per month for 158 consecutive months starting July 19, 1961. As security for the repayment of this loan petitioner assigned to the insurance company its right to receive from First Federal the $1,000 monthly payments over that period, and directed First Federal to make such payments directly to the insurance company. The petitioner's adjusted basis of the improvements made by it to the building was $56,007.33. In its income tax return for the taxable year ended May 31, 1961, the petitioner treated the $100,000 cash payment received by it under the agreement of July 1, 1960, as proceeds from the sale of "leasehold improvements," reporting a gain of $42,705.90. It used the adjusted basis of all the improvements made by it to the building. The petitioner had paid a commission of $4,375 on the sale and it allocated $1,285.77 thereof as pertaining to the sale of improvements. In such return it treated the balance of the selling price (consisting of a note in the amount *140 of $240,000 payable at $1,000 per month) as proceeds from the sale of the leasehold, reporting a gain of $236,786.77, arrived at by deducting from $240,000 the remainder of the commission, $3,088.23, and an inspection fee of $125. It elected to report such sale on the installment method, and reported as long-term capital gain $9,866.11 of the amount of $10,000 received in the taxable year. In the notice of deficiency the respondent determined that the transaction with First Federal resulted in the receipt by the petitioner of long-term capital gain of $204,671.56 in the taxable year ended May 31, 1961. His explanation was as follows: It is determined that you realized a gain from the sale of a lease in the amount of $204,671.56 in lieu of the amount of $52,572.01 reported in your income tax return. Therefore, taxable income is increased in the amount of $152,099.55. Section 453(b), Internal Revenue Code of 1954. In its return for such year the petitioner claimed as deductions automobile expenses of $1,810.44 and depreciation on an automobile of $2,650.32. In the notice of deficiency the respondent disallowed $905.52 and $2,044.29, respectively, of the *141 amounts so claimed. Opinion The petitioner contends that by the agreement of July 1, 1960, it made two separate sales, namely, the sale of the leasehold for the amount of $240,000, payable at the rate of $1,000 per month for 240 months, and the sale of "improvements" for a cash payment in the year of sale of $100,000. It therefore contends that since in the year of sale of the leasehold it received only $10,000 which does not exceed 30% of the selling price of $240,000, the sale qualifies as an installment sale within the meaning of section 453 of the Internal Revenue Code of 1954. [3]
*142 The respondent, on the other hand, determined that the gain realized as a result of the transaction was gain from the sale of the lease, and determined that the petitioner is not entitled to the benefit of the installment provisions of section 453 of the Code because of the 30% limitation contained therein. He contends that any improvements, fixtures, or equipment made or added to the building were inseparable from the lease and the leasehold premises and that the petitioner owned no salable interest in such improvements, fixtures, or equipment apart from its leasehold rights. He further contends that even if the petitioner did own and sell any such items, it has failed to prove the fair market value thereof in order to justify the allocation of any portion of the $100,000 cash payment thereto. In the notice of deficiency the respondent, in effect, allocated the full selling price to the leasehold interest. The respondent's determination is presumptively correct and the burden of proof is upon the petitioner to show error therein. Welch v. Helvering, 290 U.S. 111. See also Erwin D. Friedlaender, 26 T.C. 1005, and Violet Newton, 12 T.C. 204. *143 By the agreement of July 1, 1960, the petitioner purported to transfer to First Federal not only its interest in the lease, but also all personal property owned by it and situated on the premises, and apparatus, fixtures, and equipment owned by it located on and/or used in connection with the operation of the premises. However, such agreement does not specify the various properties transferred. It is clear from the agreement of February 17, 1950, that all the central air conditioning system installed by Vallianitis was to become the property of the lessor except the 3 compressor units. It is also clear that the improvements made by the petitioner pursuant to the lease agreement in 1958, consisting of the remodeling of one elevator, changing the type of electrical current on both of the elevators in the building, and the installation of new electric wiring, were to become the property of the lessor. The respondent makes the contention that there is no showing that Vellianitis ever transferred the 3 compressors and the 20 to 25 window air conditioning units to the petitioner. However, the evidence shows that First Federal exercised dominion over these items and disposed of them. *144 In any event, we will assume arguendo that these items had been transferred to the petitioner and were transferred by it to First Federal. The petitioner had also installed in 1958 wood paneling in the building, as well as some light fixtures. There apparently was no agreement between the petitioner and its lessor with respect to the ownership of these items, and whether they became fixtures and therefore a part of the leased realty under Alabama law is a question which we find unnecessary to decide. For present purposes we will assume arguendo that these items also were owned by the petitioner and were transferred to First Federal. Even if the petitioner did own and transfer to First Federal, by the agreement of July 1, 1960, the 3 compressor units and the 20 to 25 air conditioning units installed by Vellianitis in 1950 and the wood paneling and light fixtures installed by the petitioner in 1958, we are unable to determine how much of the selling price is properly attributable thereto. While the total selling price of all assets transferred from petitioner to First Federal was, no doubt, arrived at by arm's-length negotiations, the selling price of the individual properties was *145 not. See Particelli v. Commissioner, (C.A. 9) 212 F. 2d 498, affirming a Memorandum Opinion of this Court. It is true that throughout the negotiations the petitioner's representative insisted upon a separate cash payment of $100,000 for the improvements, fixtures, and equipment and that in the offer made by First Federal to the petitioner on March 15, 1960, it was stated that $100,000 cash was to be "allocated to the cost of fixtures, equipment, airconditioning, elevator, etc.," installed by the petitioner in the building. However, D. R. Coley, Jr., First Federal's attorney and board chairman, who carried on the negotiations for First Federal, testified that First Federal was interested in the location and that what it wanted was the lease and the leasehold premises; that it was not concerned with the improvements; that he did not have any appraisal made of the value of such improvements; that he was not interested in any value which Vellianitis might put on them; and that in the negotiations Vellianitis wanted $100,000 for his equipment and personal property and that he, Coley, "didn't argue." Under the circumstances, we cannot conclude that either the agreement or the *146 negotiations established the true selling price of whatever interest in improvements the petitioner had. Nor is the evidence presented sufficient to permit us to find the fair market value of any improvements, equipment, and fixtures which were transferred to First Federal. [4] Accordingly, we are not in a position to make an allocation of the selling price on the basis of the relative values of the separate assets. See F. & D. Rentals, Inc., 44 T.C. 335 (on appeal C.A. 7), and Estate of Peter Finder, 37 T.C. 411. It follows that we cannot conclude that the portion of the selling price of the leasehold interest received in cash in the year of the sale did not exceed 30% of the selling price, and the respondent's determination that the petitioner is not entitled to report the gain from the sale of the lease upon the installment basis is approved. *147 The petitioner contends, in the alternative, that the respondent improperly computed the profit on the sale by attributing too great a value to the right to receive installment payments of $1,000 per month for 240 months. The respondent's computation of the gain derived is not set forth in detail in the notice of deficiency and the evidence does not show what rate of discount he used. However, both parties seem to agree that he used a discount of 4%, whereas the petitioner contends that he should have used a discount of 7 1/2%. However, the petitioner offered no proof whatever to support its contention, and we are constrained to also approve the respondent's determination in this respect. On brief the petitioner specifically abandoned the issue relating to the respondent's disallowance of portions of deductions claimed as automobile expense and depreciation on automobile, and accordingly the respondent's determination in these respects is approved. Decision will be entered under Rule 50. Footnotes
1. Also signing as lessors were Helen R. Meaher, individually, and several other individuals. However, apparently the property belonged to the trust estate, and hereinafter we will refer to the lessor as the Meaher estate, as do the parties in their briefs.↩
2. Coley was authorized to act on behalf of First Federal pursuant to a resolution of its board of directors dated February 12, 1960, which authorized him "to negotiate the purchase of the lease on the Greystone Building property, at a cost not to exceed $2,500 per month for the first twenty years and $1,500 per month for the following thirty two years, with an additional payment of $100,000 to Manuel Vellianitis, * * * provided a suitable lease for a total of ninety nine years can be obtained from Meaher estate." On May 19, 1960, the board passed another resolution to the same effect except that the amount authorized to be paid to Vellianitis was increased to $105,000.↩
3. Section 453 of the Code provides in part as follows: (a) Dealers in Personal Property. - Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (b) Sales of Realty and Casual Sales of Personalty. - (1) General rule. - Income from - (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation. - Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition - (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.↩
4. The parties have stipulated that petitioner's adjusted basis of the improvements made by it to the building was $56,007.33. It should be pointed out that this apparently represents the adjusted basis of all improvements made, whether belonging to it or to the lessor, and does not represent the adjusted basis of the assets which the petitioner owned and transferred. Furthermore, the adjusted basis of the assets does not establish their fair market value.↩