PLANNED COMMUNITIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Planned Communities, Inc. v. Commissioner
Docket No. 934-78.
United States Tax Court
T.C. Memo 1980-555; 1980 Tax Ct. Memo LEXIS 26; 41 T.C.M. (CCH) 552; T.C.M. (RIA) 80555; December 16, 1980
Robert E. Teaford and Philip P. Ryser, for the petitioner. Eugene P. Bogner, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency in the amount of $ 277,987 in petitioner's income tax for the taxable year ending March 31, 1974. The issues presented are: (1) whether petitioner realized capital gain or ordinary income from the sales of three tracts of real estate; (2) whether a $ 66,000 loan acquisition fee for construction financing is deductible in full in the year paid or is to be capitalized and deducted ratably over the term of the loan; (3) whether $ 10,640.96 of petitioner's contribution deduction to a profit-sharing trust should be disallowed because the trustee erroneously refunded this *28 portion of the otherwise proper contribution and petitioner failed to repay the refund before the time for filing its tax return for the year in question; (4) whether petitioner properly accrued sales commission expenses in the amount of $ 87,128.25 for the year ended March 31, 1974; (5) whether petitioner should be permitted to deduct the costs of a meeting in Sea Island, Georgia; (6) whether petitioner is entitled to a deduction for legal and professional expenses. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference. Petitioner is an Ohio corporation which maintains its principal place of business and office in Worthington, Ohio. Petitioner filed its Federal income tax return for its taxable year ended March 31, 1974, with the Cincinnati Service Center, Cincinnati, Ohio, using the accrual method of accounting. Petitioner was incorporated on March 30, 1960. In November 1965, Lake Park Corporation, whose stock was owned by John C. Antrim and Alan L. Ortlip and members of their families, was merged into petitioner. Thereafter, and through the fiscal year ended March 31, 1974, all of petitioner's *29 outstanding common and preferred stock was owned by Antrim and Ortlip and their families. At all times relevant to these proceedings, Ortlip was president and Antrim was executive vice-president of petitioner. Since late 1964, one of the business activities of petitioner has been to acquire real estate for subdivision into residential lots for sale to customers in the ordinary course of business. All of petitioner's sales of residential lots, whether sold in bulk or by single lot, since late 1964 through March 31, 1974, have been reported on its income tax returns as ordinary income. Since late 1974 and through the fiscal year ended March 31, 1975, petitioner made five sales of real estate involving six parcels on which it claimed capital gain or loss. From late 1964 through 1974, petitioner plotted subdivisions consisting of 1,412 lots. At any given time, petitioner would be involved in developing and sales in several different subdivisions. Petitioner has never built any homes on the residential lots that it developed. In the mid-1960's, following the merger, petitioner decided that, due to the cyclical nature of the single family lot sales, it should acquire and develop *30 properties to be held to produce rental income. On July 15, 1966, petitioner acquired a 168.112 acre tract of real estate (the Wilson Bridge Road property), at a cost of $ 4,500 per acre. The Wilson Bridge Road property was located in Worthington, County of Franklin, Ohio, when it was acquired by petitioner. Worthington is a suburb of Columbus, Ohio, located north of the Columbus city limits. The Wilson Bridge Road property was being used as a farm by the previous owner at the time it was acquired by petitioner. On April 6, 1967, petitioner filed five separate zoning applications to have portions of the Wilson Bridge Road property rezoned to permit usage as follows: (1) 9.41 acres for highway and automotive services; (2) 25.99 acres for a community shopping center; (3) 8.17 acres for institutional and office purposes; (4) 17.10 acres for cluster grouping of apartment residential units; (5) 51.75 acres from single family residences on 16,000-square-foot lots to those requiring 10,400-square-foot lots. Applications (1), (2), and (5) were approved before the end of 1967 and application (3) was approved on January 12, 1970. On November 6, 1969, petitioner renewed its application *31 to have a portion of the property rezoned to permit the cluster grouping of apartments (see item (4) above), increasing the area to 20.551 acres in its application. The application was approved on January 12, 1970. The remaining portion of the Wilson Bridge Road property not covered by the zoning application was dedicated to streets, and a portion was sold to the State of Ohio for the development of the interstate highway system. In January 1969, 8.984 acres of the 9.41 acres of the Wilson Bridge Road property rezoned for highway and automotive services were sold to Humble Oil and Refining Co. Petitioner reported this transaction as giving rise to ordinary income. This property was subsequently improved with a motel and service station. Two sales were made from the institutional and office zoned portion of the Wilson Bridge Road property. In March 1974,.221 acres were sold to the City National Bank for a bank building, and in July 1975,.918 acres were sold to Dollar Savings Association for a savings and loan building. Petitioner developed the Worthington Square Shopping Center on the portion of the Wilson Bridge Road property set aside for a shopping center in two separate *32 phases. Phase I was constructed in 1971 and 1972 and Phase II was constructed in 1973 and 1974. The total cost for both phases was approximately $ 4,618,047. Petitioner developed the shopping center prior to building apartments because there was no similar shopping of this type within five miles despite a substantial population. It thought this would enhance its later develoipment prospects. Petitioner obtained approval for a construction loan and long-term (25-year) financing for Phase II of the shopping center in its fiscal year 1974. Petitioner was charged a loan acquisition fee [1] of $ 66,000 by the lender, Connecticut General Life Insurance Company, for the financing, which it deducted as interest. In a footnote to petitioner's financial report for the year ending March 31, 1974, it is stated, "Deferred financing fees are amortized on a straight-line basis over the life of the permanent loans." On August 27, 1970, petitioner acquired for $ 350,000 a 59.863 acre tract of property (the Cooper Road property) located *33 southeast of the Cleveland Avenue interchange with I-270 in the Township of Blanden, County of Franklin, Ohio, which was adjacent to the Columbus city limits, almost directly north of downtown Columbus. The Cooper Road property was annexed to the City of Columbus on June 25, 1971, pursuant to a petition therefor filed by petitioner on August 21, 1970, and was zoned residential. On November 11, 1971, petitioner filed an application to have the entire Cooper Road tract rezoned to apartment residential-low density. The application was approved as to 47.78 acres in March 1972, with the remaining acreage being set aside for street dedication, a private park, and dedication for a Columbus city park. Petitioner's vice-president of development, Jack Bachtel, recognized that the market for apartments in the Columbus area had become oversaturated by the end of 1972 and was likely to remain so in the reasonable future. Thus, any apartment buildings which may have been planned became impractical at that time. Landco, Inc. (Landco), had persistently attempted to purchase the apartment-zoned portion of the Wilson Bridge Road property in 1972, but was turned down by petitioner. Finally, *34 in early 1973, after it offered to purchase both the Wilson Bridge Road and the Cooper Road properties, petitioner agreed to the sale. Petitioner had not actively solicited customers for these properties, nor for the Wilson Road property discussed infra. On March 15, 1973, the apartment-zoned tract of the Wilson Bridge Road property and 52.157 acres of the Cooper Road property (excluding 7.706 acres dedicated to the City of Columbus for a public park) were sold to Landco for a total selling price of $ 1,225,000, with $ 525,000 allocated to the Wilson Bridge Road property and $ 700,000 to the Cooper Road property. Petitioner realized a gain of $ 626,276 on the Cooper Road property and $ 314,829 on the Wilson Bridge Road property. Petitioner reported the sale in its income tax return for the fiscal year ending March 31, 1973, as capital gain, electing the installment method of reporting income from the sale. Landco intended to construct apartments on the two tracts, but was never able to do so. In January and February 1969, petitioner acquired two contiguous tracts of real estate, each fronting on Wilson Road, of 27.280 and 21.395 acres, located in Franklin Township, *35 Franklin County, Ohio (the Wilson Road property). The Wilson Road property was almost due west of downtown Columbus and was located a short distance outside the Columbus city limits when it was acquired. The property was annexed to the City of Columbus upon petitioner's request. The Wilson Road property was zoned for residential usage at the time it was acquired. On March 27, 1970, petitioner filed an application to have the Wilson Road property rezoned for commercial usage for 10.2 acres of the property with frontage on Wilson Road and apartment residential-low density zoning for the remaining 39.1 acres. The requested rezoning was approved in 1970. In 1972, petitioner constructed an office building on the portion of the Wilson Road property which had been rezoned for commercial usage. The tenant for the office building, the American Automobile Club Insurance Company, had been found prior to the construction of the building. The cost of the building was approximately $ 800,000. The lease for the building contained an option for the lessee to purchase the building after ten years. The property was sold to the lessee in a negotiated sale in 1979. In January 1973, 1.823 *36 acres of the commercial portion of the Wilson Road property was sold to the City National Bank. In December 1973, the entitre portion of the Wilson Road property which had been zoned for apartment usage was sold to Landco for $ 500,000. The property was deeded to Worthington Mortgage and Investment Company, which was another company controlled by Walter Krumm, who controlled Landco. Petitioner realized a gain of $ 267,687 from this sale, reporting it as capital gain on its income tax return for the year ending March 31, 1974. The remaining installment portions of the gains in the amounts of $ 251,864 and $ 447,340 from the sales of the Wilson Bridge Road property and the Cooper Road property, respectively, were also reported as capital gain on that return. Within five or six months of its purchase of the Wilson Road property, Worthington Mortgage and Investment Company constructed apartments on that site at an approximate cost of $ 8,000,000. Shortly thereafter, however, it lost the apartments and its equity to the bank which had provided financing, due to market conditions in 1974-1975. The shopping center and Wilson Road office building are the only two buildings petitioner *37 has ever constructed on any real estate it has owned. Both were not good investments and petitioner was interested in selling them as early as March 1974 because the indebtedness incurred by petitioner on these projects was impeding its ability to obtain additional financing at that time. Petitioner had a site layout, building placement sketchings, and floor plans prepared by an architectural firm for apartments on the Wilson Bridge Road property in late 1972. Further planning was discontinued when it was determined the market was oversaturated. No final plans necessary for a building permit, such as specifications or elevations, were completed. Petitioner paid over $ 7,000 for these preliminary plans. In addition, petitioner prepared cost and rental income projections for the Wilson Bridge Road property. Petitioner also had a preliminary site plan for a proposed apartment development prepared for the Wilson Road property which was filed with its rezoning application for the property. No architectural drawings of any kind were prepared for the Cooper Road property. Petitioner has never constructed any apartments. Petitioner had no income from rents during the calendar *38 years 1968 through 1972. Subsequently it had rental income of $ 42,331 for the period January 1, 1973 - March 21, 1973, $ 245,082 for the year ending March 31, 1974, and $ 372,771 for the year ending March 31, 1975. On September 14, 1973, petitioner made a payment of $ 5,000 to the trustee of its profit-sharing plan. At the end of petitioner's March 31, 1974, year, petitioner accrued an additional liability in the amount of $ 34,966.68, which was paid to the trustee on August 23, 1974. Petitioner had an extension to file its March 31, 1974, return on or before December 15, 1974. The trustee of the plan erroneously calculated that petitioner made an excess contribution of $ 10,640.96 to the plan and refunded this amount to petitioner on October 22, 1974. Petitioner, on receipt of the trustee's refund check, established a liability on its books for the amount of the refund check, but did not repay the erroneous refund until fiscal year 1976 (probably August or September 1975). On its return for the year ended March 31, 1974, petitioner deducted $ 39,966.68 as its contribution to the plan. The trustee allocated the entire $ 39,966.68 among the plan participants for the plan *39 year ending December 31, 1973, after its error was rectified. For its fiscal year ending March 31, 1974, petitioner accrued a commission expense of $ 87,128.25 with the explanation "to accrue sales commissions on Webb and Burt-Hartley." The Burt-Hartley property in actuality was the Wilson Road property. The commissions were accrued as being payable to Live Oak Corporation, a Subchapter S corporation. The common stock of Live Oak was owned at this time by Antrim and Ortlip. In the year ending March 31, 1975, this accrual was reversed by debiting the commissions payable account and crediting retained earnings. In effect this reduced commissions payable and increased petitioner's taxable income by $ 87,128.25 for its fiscal year ending March 31, 1975. The corporate minutes of a directors' meeting held on December 5, 1974, state concerning this commission as follows: The President further advised the Board that during the year ended March 31, 1974, the company accrued real estate commissions of $ 142,125.00 to an affiliated company. He advised that subsequently $ 87,125.00 of this obligation had been adjusted and that therefore, $ 87,125.00 of commissions payable would be written *40 off during the year ended March 31, 1975.
The financial statement prepared for petitioner for the year ending March 31, 1975, states as follows concerning this commission: PRIOR YEAR RESTATEMENT During the year ended March 31, 1974, the Company accrued $ 87,125 of real estate commissions to an affiliated company. During fiscal 1975 it was determined by the parties that these commissions would not be paid. Accordingly, the Company has retroactively adjusted commission expense as of March 31, 1974. This adjustment had the effect of increasing net income for the year ended March 31, 1974 by $ 45,305 (net of $ 41,819 Federal income taxes) or $ 3.38 per share. Petitioner deducted the amount of $ 2,916 as representing the cost of an alleged meeting in Sea Island, Georgia, attended by four of petitioner's officers (including its attorney) and four other individuals, three of whom were employees of the City of Columbus. [2] The cost is broken down as $ 1,870.50 paid for the use of a plane to transport the individuals in attendance, $ 354.20 as a reimbursement of expenses paid by Ortlip, and $ 690.96 as paid to Sea Island Resort Company. *41 ULTIMATE FINDING OF FACT Petitioner held the three properties in question for investment purposes and not primarily for sale to customers in the ordinary course of its trade or business. OPINION The principal issue herein is whether the sales of certain tracts of real property produced ordinary income or capital gain for a real estate developer. Section 1221(1)[3] denies capital gain treatment to gains arising from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The purpose of this provision "is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand * * * and 'the realization of appreciation in value accrued over a substantial period of time' on the other." Malat v. Riddell,383 U.S. 569, 572 (1966).The definition of capital asset is to be narrowly applied and its exclusions are to be interpreted broadly. Gartrell v. United States,619 F.2d 1150, 1154 (6th Cir. 1980).
*42 Petitioner concedes that it was a dealer in real estate as to certain properties, primarily residential, but not as to the three tracts involved herein. While the general nature of the seller's business is to be considered, it is well established that a taxpayer in the real estate business may hold some real estate as a capital asset. Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1284 (1970). Moreover, the fact that a taxpayer may have an initial investment purpose is not controlling, because such purpose is subject to change; it is the purpose of holding the property at the time of sale which is determinative. Eline Realty Co. v. Commissioner,35 T.C. 1 (1960); Bauschard v. Commissioner,31 T.C. 910, 917 (1959), affd. 279 F.2d 115 (6th Cir. 1960). The issue of whether, at the time of sale, property was held for investment or primarily for sale to customers in the ordinary course of the taxpayer's trade or business *43 is a question of fact. Philhall Corp. v. United States,546 F.2d 210, 214 (6th Cir. 1976); Pritchett v. Commissioner,63 T.C. 149, 162 (1974). A number of factors have been considered in resolution of this issue. See, e.g., Gartrell v. United States,supra; Buono v. Commissioner,74 T.C. 187, 199 (1980). No single factor, or combination of factors, is controlling; each case necessarily turns upon its own peculiar facts viewed in light of all the surrounding circumstances. Gartrell v. United States,supra; Buono v. Commissioner,supra.Moreover, the mere fact of ultimate sale is not determined. Pritchett v. Commissioner,63 T.C. at 165. Finally, the property must not only have been "held primarily for sale," but also for sale in the "ordinary course of business." Howell v. Commissioner,57 T.C. 546, 555 (1972). Petitioner has the burden of proving that when it dealt with the parcels of land here involved, it did so an an investor rather than as a dealer. This burden must be carried separately for each sale. Pritchett v. Commissioner,63 T.C. at 164. *44 Petitioner acquired the Wilson Bridge Road property with a dual motive. It planned to obtain rezoning for several uses whereby some of the land would be sold in the ordinary course of its business and it would develop the remainder for investment income. To the extent that petitioner treated the differently zoned portions of the property as held for different purposes from the beginning, we will treat them independently. See and compare Westchester Development Co. v. Commissioner,63 T.C. 198, 208-210 (1974). See also Slappey Drive Industrial Park v. United States,561 F.2d 572, 587-588 and n. 31 (5th Cir. 1977).Petitioner had initial plans and cost projections prepared for this property. Aside from the rezoning, it did not subdivide the property, nor did it make any improvements to this portion of the land. Petitioner's activity with respect to developing the Cooper Road property was less extensive. It had the property annexed to the City of Columbus, in order to obtain water and sewage access, and had it rezoned for residential apartment usage. Petitioner also had the Wilson Road property annexed. This property was rezoned into two *45 sections -- commercial and residential. An office building was constructed on part of the commercially zoned section and some of the land in that section was sold. [4] A preliminary site plan for the proposed apartments was prepared for the zoning application. No other plans or improvements were made by petitioner. We recognize the hazards of relying on the self-serving testimony of petitioner's officers as to their purpose in acquiring and holding this land. See Philhall Corp. v. United States,546 F.2d at 215. Nonetheless, we have found their testimony on this issue credible and not contradicted by the objective evidence. See Casalina Corp. v. Commissioner,60 T.C. 694, 702 (1973), affd. per curiam on other issues 511 F.2d 1162 (4th Cir. 1975). In this context, although we have dealt with each parcel separately, we think it appropriate to note the supportive character of evidence as to petitioner's total effort to venture into the *46 area of investing in rental properties, including not only apartment buildings but an office building and shopping center, both of which produced substantial rental income. It is clear to us that petitioner acquired and initially held the properties in question for investment. Such original intention is a factor to be taken into consideration, although it may loss its force because of later developed indicia of activity. See Biedenharn Realty Co. v. United States,526 F.2d 409, 421 (5th Cir. 1976). Subsequent developments indicate merely a slight change of emphasis in petitioner's thinking as to the use of the properties and are not, in our opinion, sufficient to cause us to conclude that its basic purpose had changed by the taxable yeare before us. Petitioner's officers abandoned their plans to construct apartments as investment income properties because they perceived that the Columbus market was oversaturated with apartments. From that point, petitioner simply passively held the properties for the oversaturation of the rental apartment market to abate or to take advantage of an offer to buy which it could not afford to pass up, if such offer came along. In *47 short, it did not abandon its original purpose but merely put its plans for apartment development temporarily in the deep freeze. Petitioner did not actively seek offers to purchase; it engaged in no advertising or active listing of the properties. [5] The ultimate purchaser(s), Landco (and its related corporation Worthington), approached petitioner several times before petitioner finally relented and agreed to sell. See Westchester Development Co. v. Commissioner,63 T.C. at 208; Pritchett v. Commissioner,63 T.C. at 165, 167, 168. Based upon our evaluation of the entire record herein, including the testimony of the witnesses whom we saw and heard, we hold that the three properties in question were not held for sale in the ordinary course of petitioner's business. At the most, petitioner was liquidating an investment *48 which, at least for the time being, could not be brought to fruition due to changed circumstances. See Huxford v. United States,441 F.2d, 1371, 1375-1376 (5th Cir. 1971), and the discussion of the "liquidation niche" in Biedenharn Realty Co. v. United States,526 F.2d at 417, 421-422. Cf. Heller Trust v. Commissioner,382 F.2d 675 (9th Cir. 1967), affg., revg., and remanding two Memorandum Opinions of this Court; Rouse v. Commissioner,39 T.C. 70, 76 (1962). Petitioner is therefore entitled to capital gain treatment in respect of the sale of the three properties in question. The next issue presented is the proper treatment of the $ 66,000 loan commitment fee paid to Connecticut General for the permanent financing. Petitioner deducted the entire amount as prepaid interest, whereas respondent determined the sum should be capitalized and deducted ratably over the term of the loan. Petitioner has presented no evidence to convince us that the fee was paid as interest, i.e., "for the use or forebearance of money" ( Deputy v. Du Pont,308 U.S. 488, 498 (1940)), and indeed the loan agreement *49 indicates that it was for services. See footnote 1, supra; Enoch v. Commissioner,57 T.C. 781, 785 (1972). However, regardless of which category applies to the fee, petitioner, as an accrual-basis taxpayer, is required to amortize the amount over the term of the loan. Lay v. Commissioner,69 T.C. 421 (1977). See also Detroit Consolidated Theatres, Inc. v. Commissioner,133 F.2d 200 (6th Cir. 1942), affg. per curiam a Memorandum Opinion of this Court. Cf. Baird v. Commissioner,68 T.C. 115, 131 (1977) (cash-basis taxpayer). We turn now to the issue of whether $ 10,640.96 of petitioner's profit-sharing deduction for fiscal 1974 should be disallowed because the trustee erroneously refunded this portion of the contribution to petitioner in October 1974 and it was not repaid by petitioner before the time for filing its tax return for that year.
Section 404(a)(3) allows a deduction for contributions paid into an employee profit-sharing trust subject to certain limitations. One limitation is that such contributions *50 are generally deductible only for the year in which they are actually paid. See section 1.404(a)-1(c), Income Tax Regs..An accrual basis taxpayer, however, is allowed a period for payment "not later than the time prescribed by law for filing the return for [the] taxable year [of accrual] (including extensions thereof)." Section 404(a)(6). Petitioner's return was not due until December 15, 1974. The $ 39,966.68 which petitioner paid to the trustee by August 23, 1974, was not in excess of what it would have been allowed as a deduction under section 404(a)(3). Petitioner argues that it has complied with the requirements of the statute and regulations that the contributions be paid before its income tax return was due. Respondent counters with the assertion that the refund by the trustee, even though erroneous, had the effect of causing the nonpayment of the contributions in the amount of the refund and that, to such extent, a deduction should not be allowed because the repayment of such refund did not occur until after petitioner's return for fiscal year 1974 was filed. We agree with petitioner. The payment was in fact timely made and there *51 is no evidence to suggest, nor does respondent contend, that the refund by the trustee was not made in good faith. [6] We hold that the statutory requirement has been satisfied. The cases relied upon by respondent [7] all involved situations where timely payment was not made. They are therefore distinguishable. In view of our holding, we have no reason to consider the proper tax treatment of the refund, e.g., under the "tax benefit" rule, and/or of the subsequent repayment thereof. The next issue is the proper treatment of the $ 87,128.25 in sales commission expenses on the Wilson Road property accrued by petitioner during the taxable year in issue.Petitioner *52 is entitled to deduct the sales commission expense in the year in which all events have occurred which determine the fact of the liability, and the amount can be determined with reasonable accuracy. Section 1.461-1(a)(2), Income Tax Regs.; United States v. Anderson,269 U.S. 422 (1926). The burden of proof is on the petitioner to establish the fact of the liability. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. There is nothing in the stipulated facts that would carry this burden, nor did petitioner produce any additional evidence at trial to support its position. We, therefore, resolve this issue against the petitioner. We next face the issue of whether petitioner should be permitted to deduct the cost of a meeting at Sea Island, Georgia. Petitioner argues that it has complied with the requirements of section 274 because it has established the amounts that were spent, the individuals involved, and their business relationship. This is insufficient, however, because petitioner has not established that any business meetings or discussions took place at Sea Island; *53 the stipulation merely reads "alleged meeting," and no additional evidence was adduced at trial. Thus, petitioner has not established that the expenses were ordinary and necessary under section 162(a), nor that they were directly related to or associated with the active conduct of its business. Section 274(a)(1). Since petitioner has failed to carry its burden of proof, this issue must be decided in favor of respondent. The final issue, relating to respondent's disallowance of claimed legal and professional expenses, appears to have been abandoned by petitioner on brief, because petitioner does not discuss it and refers only to the five issues already discussed. To the extent that it has not been abandoned, it is resolved in respondent's favor because petitioner has failed to carry its burden of proof. Decision will be entered under Rule 155. Footnotes
1. The commitment agreement stated that the fee was in "consideration for the issuance of this commitment and the holding of funds for future disbursement."↩
2. The remaining attendee was an attorney who had been involved in prior litigation involving petitioner but was not associated with the petitioner at the time of the trip.Z↩
3. Section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
4. The treatment of the sales of the commercially zoned land is not before us. We are treating the commercially zoned sections separately from those zoned for apartments. See p.19, supra↩.
5. We recognize that, in the commercial real estate context, the lack of advertising or other sales promotion activity is a minor factor as opposed to the importance of such activity in the residential real estate market. Jersey Land & Development Corp. v. United State,539 F.2d 311, 316↩ (3d Cir. 1976).
6. Nor is there any suggestion of collusion or of other questionable action on petitioner's part in not straightening the matter out and making the repayment between October 22 and December 15, 1974. ↩
7. Gillis v. Commissioner,63 T.C. 11 (1974); Walt Wilger Tire Co. v. Commissioner,T.C. Memo. 1979-66; Springfield Productions, Inc. v. Commissioner,T.C. Memo. 1979-23↩.