GORDON H. GILLIS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ELEANOR S. GILLIS, A.K.A. ELEANOR S. BEACH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7492-72, 273-73.    Filed October 2, 1974.

*Sherman F. Levey,* for the petitioners.
*John D. Steele, Jr.,* for the respondent.

FEATHERSTON, *Judge:* Respondent has determined that each of the petitioners in these consolidated cases is liable as a transferee for income tax deficiencies due from 2560 Corp. (formerly B-G Equipment Co., Inc.), transferor, for the taxable years ended March 31, 1967, and March 31, 1968. The deficiencies so determined are in the amounts of $11,633.60 and $6,762.15 for those years, respectively. Petitioners acknowledge that each of them is a transferee of the assets of 2560 Corp. within the meaning of section 6901,[1] but they allege that respondent erred in his determination of deficiencies in the income taxes of the corporation for those years. The only issue presented for decision is whether, for purposes of section 404(a)(6), the corporation paid to its employees' profit-sharing

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

plan the full amounts accrued on its books for the taxable years ended March 31, 1967, and March 31, 1968.

FINDINGS OF FACT

Petitioners Gordon H. Gillis and Eleanor S. Gillis,[2] husband and wife, were legal residents of Rochester, N.Y., at the time they filed the petitions. They each owned 50 percent of the outstanding stock of 2560 Corp. (formerly B-G Equipment Co., Inc., herein referred to as B-G or the corporation). B-G was a New York corporation engaged in the sale, service, and rental of construction equipment. B-G filed its income tax returns using the accrual method of accounting and a fiscal year ending March 31.

Both petitioners participated in the operation of B-G's business. Mr. Gillis served as president of the corporation, overseeing the sales and service end of the business, and Mrs. Gillis served as vice president and treasurer, taking responsibility for administrative functions, office management, and financial affairs. Her duties included the maintenance of the corporation's books and records. Only she was authorized to sign checks on behalf of the corporation.

Effective April 1, 1962, B-G established a profit-sharing plan for its employees known as the "B-G Equipment Co., Inc. Employees' Retirement Income Plan" (hereinafter plan or B-G trust). The plan was amended on June 14, 1963, and by letter dated June 24, 1963, B-G was notified by the district director that the plan and trust, as amended, qualified under sections 401 and 501, respectively, as of April 1, 1962. Petitioners and an accountant who had assisted them in obtaining a favorable determination letter were designated as the trustees of the plan, but only Mrs. Gillis was active in that capacity. During the taxable years in issue, the plan maintained two savings accounts but did not have a checking account.

At the end of each taxable year, Mrs. Gillis would determine the amount to be contributed to the plan by multiplying the qualified payroll by 15 percent. She would then make journal and ledger entries, debiting the "Retirement Income Plan" expense account and entering a corresponding credit to the "Accrued Expenses" account. These bookkeeping entries were made on B-G's books. No independent set of financial books or records was

---

[2] For business purposes, Mrs. Gillis used her maiden name of Eleanor S. Beach.

maintained for the plan itself, except for yearend summaries prepared by Mrs. Gillis.

Within 2 weeks of the close of each taxable year, Mrs. Gillis would send each plan member a written statement reflecting the amounts accrued to his individual plan account for the year just ended, together with a computation of the total amount contained in his account, as reflected on B-G's books. Thereafter, acting principally on the advice of investment consultants, she would make investments in the name of the plan by causing B-G to issue its own check directly to a brokerage firm to purchase selected securities. Once such an investment was made, B-G's books would be adjusted by debiting the "Accrued Expenses" account and crediting the "Cash" account correspondingly.

On March 31, 1967, the last day of B-G's fiscal year, Mrs. Gillis made a journal entry on B-G's books, debiting the "Retirement Income Plan" expense account by $27,396.55 and crediting the "Accrual" expense account by the same amount.[3] Earlier in the year B-G had purchased in the name of the plan securities with a value of $7,101.83. On or about May 17, 1967, B-G purchased for the plan additional securities worth $3,159.88. Thus, while B-G actually purchased only $10,261.71 worth of securities on behalf of the plan from March 31, 1966, to June 15, 1967, it accrued on its books and deducted on its income tax return a profit-sharing plan contribution of $34,498.38.

At the close of its next fiscal year ended March 31, 1968, Mrs. Gillis again made a journal entry to B-G's regular books, debiting the "Retirement Income Plan" expense account and crediting the "Accrual" expense account by $36,044.15, an amount representing 15 percent of the qualified payroll for the fiscal period. During the period between December 20, 1967, and March 31, 1968, B-G purchased for the plan securities in the amount of $5,694.65 and contributed cash in the amount of $18,542.02. Thus, for the taxable year ended March 31, 1968, while B-G accrued on its books and deducted on its income tax return a profit-sharing plan contribution of $36,044.15, it in fact contributed cash and securities to the plan in the amount of only $24,236.67.

---

[3] The amount actually recorded was $26,746.80. The parties acknowledge that a mathematical error in addition was made on B-G's books and that the accrual of $26,746.80 was understated and in fact should have been in the amount of $27,396.55. The discrepancy is not material and is not in issue in this proceeding.

On or about March 31, 1968, B-G sold substantially all its assets to an unrelated third party who agreed to retain B-G's deferred profit-sharing plan for those employees continuing to work for it after the closing date.

On or about August 5, 1968, B-G remitted $36,044.15 (plus interest not herein material) to Marine Midland Trust Co. of Rochester, N.Y., which had previously qualified as successor trustee of the B-G plan. This sum represented the entire amount accrued on the books of B-G which had not previously been actually paid under the plan.

The following is a transcript of debits and credits made to the "Retirement Income Plan" account on B-G's books beginning March 31, 1966:

| Date | Entry | Debit | Credit | Balance |
|------|-------|-------|--------|---------|
| Mar. 31, 1966 | Accrual-receivable | $22,900.31 | 0 | $22,900.31 |
| June 13, 1966 | Securities received | 0 | $24,998.84 | (2,098.53) |
| Aug. 31, 1966 | Securities received | 0 | 5,003.30 | (7,101.83) |
| Mar. 31, 1967 | Accrual-receivable | 34,498.38 | 0 | 27,396.55 |
| May 17, 1967 | Securities received | 0 | 3,159.88 | 24,236.67 |
| Dec. 20, 1967 | Securities received | 0 | 5,694.65 | 18,542.02 |
| Mar. 31, 1968 | Accrual-receivable | 36,044.15 | . 0 | 54,586.17 |
| Mar. 31, 1968 | Cash received | 0 | 649.75 | 53,936.42 |
| Mar. 31, 1968 | Cash received | 0 | 17,892.27 | 36,044.15 |
| Aug. 5, 1968 | Cash received | 0 | 36,044.15 | 0 |

During the taxable years in issue, B-G's cash account never went below $119,393.24, and was as high as $458,805.09. The average monthly balance for the period March 31, 1967, through June 30, 1968, was $291,699.76.

On June 27, 1972, respondent sent a notice of liability to each petitioner, as a transferee of the assets of B-G, determining a deficiency in B-G's income tax on the ground that deductions taken by B-G for contributions to the profit-sharing plan were excessive for the 2 years in issue since the claimed amounts were not paid in full within the time prescribed by section 404(a)(6).

OPINION

The Code provision on pension, profit-sharing, and stock bonus plans (secs. 401 through 407) is designed "to encourage the setting up of retirement benefits by employers for their employees and in pursuance of this policy permits employers to take as a deduction amounts irrevocably set aside in a pension trust or other fund to provide annuities or retirement benefits for

superannuated employees." H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 413.

In recognition of the fact that deferred-compensation plans are subject to abuse and tax avoidance, the statute places important restrictions on employers' deductions for contributions under such plans. One of those restrictions, found in section 404(a)(3),[4] is that an employer's deduction for a payment to a stock bonus or profit-sharing trust is allowable only "In the taxable year when paid." For taxpayers on the accrual basis, section 404(a)(6)[5] modifies the rule to some extent. It provides that a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual "if the payment is on account of such taxable year and *is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof)."* (Emphasis added.) Section 6072(b) provides that returns of a corporation using a fiscal year shall be filed on or before the 15th day of the third month following the close of the fiscal year.

The evidence is abundantly clear that the payments here in dispute do not meet the requirements of sections 404(a)(3) and 404(a)(6), because they were not made within the prescribed period. B-G employed the accrual method of accounting and used a fiscal year ending March 31. No extension of time was granted

---

[4] SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:
* * *

(3) STOCK BONUS AND PROFIT-SHARING TRUSTS.—

(A) LIMITS ON DEDUCTIBLE CONTRIBUTIONS.—In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan. * * *

[5] Sec. 404(a)(6) reads as follows:

(6) TAXPAYERS ON ACCRUAL BASIS.—For purposes of paragraphs (1), (2), and (3), a taxpayer on the accrual basis shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof).

or requested for filing its return for either one of the taxable years ended March 31, 1967, and March 31, 1968, and under section 6072(b) such returns were, therefore, due by June 15 of each year, respectively. Deductions have been allowed for all timely payments by B-G to the plan, amounting to $10,261.71, between March 31, 1966, and June 15, 1967, and $24,236.67, between June 15, 1967, and June 15, 1968. The total amount ($36,044.15) of the disputed deductions was not paid until August 5, 1968, long after the dates prescribed by law for the filing of its tax returns for the 2 years in issue. The August 5, 1968, payment, therefore, was not timely and is not deductible. *Hydro Molding Co.,* 38 T.C. 312 (1962); sec. 1.404(a)-1(c), Income Tax Regs.

Petitioners make a series of resourceful arguments, emphasizing the accrual on the corporation's books of the liabilities to the B-G trust, notification to the employees of the accruals, the availability at all times of sufficient cash to pay the accruals, Mrs. Gillis' dual capacity as both the treasurer of the corporation and the trustee of the B-G trust, and her lack of knowledge that actual payment to the trust was required by the statute to be made within any specified time. Those facts, if they be true, do not show that the disputed amounts were irrevocably set aside in the trust or placed beyond the reach of creditors or the direct control of the corporation. The controlling statutes contain no exceptions allowing deductions in such circumstances.

Petitioners attempt to spell out a theory that, since Mrs. Gillis was both treasurer of B-G and trustee of the B-G trust, she constructively received the payments as trustee within the prescribed time, citing a line of cases arising under section 267. They maintain that such "receipt" qualifies the payments. But Mrs. Gillis' status as a trustee entitled her to none of these payments until she took appropriate action as treasurer of the corporation to make the money available to the B-G trust. Sec. 1.451-2(a), Income Tax Regs.[6] Moreover, the statutes here controlling, sections 404(a)(3) and 404(a)(6), by their express terms are directed toward *payment* by the taxpayer rather than receipt

---

[6] Sec. 1.451-2(a), Income Tax Regs., is, in part, as follows:

(a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. * * *

by the trustee, and there is no necessary correlation between the constructive receipt and the payment of funds. See, e.g., *Mass. Mutual Life Ins. Co. v. United States,* 288 U.S. 269, 274 (1933); *Vern Realty, Inc.,* 58 T.C. 1005, 1011-1013 (1972), affirmed per order (C.A. 1, Apr. 26, 1973). Petitioners have not shown that B-G timely paid the disputed funds to the trust.[7]

Petitioners urge us to expand or modify the terms "paid" or "payment," holding that substantial compliance with the statute is sufficient in order to avoid denial of a deduction for the disputed payment.[8] But we cannot ignore the plain language of the statute or the purposes it was designed to serve. Congress has hedged deductions for deferred compensation with a host of requirements which are designed to assure, as a condition to deductibility, that the funds are irrevocably set aside for the employee-beneficiaries' benefit within prescribed periods of time. Otherwise, the payments might never be made in cases of insolvency, bankruptcy, or other unforeseen conditions. The good-faith intentions of petitioners in this case ultimately to make the payments are not in dispute. But the statutory requirement is not conditioned on good intentions. The statute prescribes specific requirements which must be met if the deduction is to be allowed. B-G's August 5, 1968, payment simply did not meet the requirement of section 404(a)(6) that the payment be made within the time prescribed by law for filing the returns for the years in issue. As stated in *F. & D. Rentals, Inc.,* 44 T.C. 335, 349 (1965), affd. 365 F.2d 34, 41 (C.A. 7, 1966), certiorari denied 385 U.S. 1004 (1967), where we held that an assumption agreement would not support a deduction for contributions to a pension trust—

---

[7] The cases arising under sec. 267, cited by petitioners, include *Fetzer Refrigerator Co. v. United States,* 437 F.2d 577 (C.A. 6, 1971); *Hyplains Dressed Beef, Inc.,* 56 T.C. 119 (1971); and *C. D. Fountain,* 59 T.C. 696 (1973). Sec. 267(a)(2) disallows deductions for items of unpaid expenses and interest on stated conditions. One of the conditions requires consideration of whether the amounts of the disputed items are includable in the gross income of the person to whom the payment is to be made, and the regulations (sec. 1.267(a)-1(b)(iii)) under that section expressly provide that the doctrine of constructive receipt may be used to determine when this has occurred. No such provision appears in sec. 404(a)(3) or 404(a)(6), or the related regulations. In fact, sec. 1.404(a)-1(c), Income Tax Regs., explains that sec. 404(a)(6) applies only where "payment is actually made" within the prescribed period.

[8] The cases of *Wasatch Chemical Co. v. Commissioner,* 313 F.2d 843 (C.A. 10, 1963), reversing 37 T.C. 817 (1962); *Time Oil Co. v. Commissioner,* 258 F.2d 237 (C.A. 9, 1958), reversing 26 T.C. 1061 (1956); and *Sachs v. Commissioner,* 208 F.2d 313 (C.A. 3, 1953), reversing *Slaymaker Lock Co.,* 18 T.C. 1001 (1952), dealing with the question of whether the transfer to an exempt trust of the employer-taxpayer's promissory note represented "payment" within the meaning of sec. 404 (a)(6), are distinguishable on their facts.

The statutory scheme, it seems clear enough, requires that an accrual basis taxpayer part with something of value to the pension plan trustee. Petitioner did not part with anything during the required time. It only accrued an obligation on its books. And that is not enough.

The same reasoning is applicable here.

*Decisions will be entered for the respondent.*