INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, and Its Local 449, Plaintiffs-Appellees,

v.

KEYSTONE CONSOLIDATED INDUSTRIES, INC., Defendant-Appellant.

No. 84–1722.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1985.

Decided June 12, 1986.*

As Amended June 25, 1986.

---

* The panel, with Judge Coffey dissenting, issued an opinion reversing the District Court on February 3, 1986. The appellee filed a Petition for Rehearing with Suggestion for Rehearing *en banc* and the Tax Division of the Department of Justice submitted an amicus brief in support of the appellee's Petition for Rehearing. Upon reconsideration, the panel voted to withdraw the opinion issued February 3, 1986 and to issue an opinion affirming the District Court.

Robert C. Long, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellant.

M. Jay Whitman, UAW Legal Dept., Detroit, Mich., for plaintiffs-appellees.

Before COFFEY and FLAUM, Circuit Judges, and JAMESON, Senior District Judge.[1]

COFFEY, Circuit Judge.

Keystone Consolidated Industries, Inc. appeals the district court's enforcement of an arbitrator's award requiring Keystone to make annual contributions to a pension plan pursuant to a collective bargaining agreement, even though the company had obtained a waiver of the minimum funding obligation imposed by Section 302 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1082. We affirm.

### I.

The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union") and the National Lock Division of Keystone Consolidated Industries, Inc. ("Keystone") have been parties to a series of pension agreements since 1955. Beginning in 1968 and continuing to the present, these pension agreements provided that Keystone shall make annual contributions to the pension's trust fund. The pension agreement between Keystone and the Union provided in relevant part:

"The Company agrees to make contributions to the [pension] trust fund on an annual basis during the term of this Agreement in the amount of ... [sums] determined by the independent actuary employed by the company in the valuation of the pension plan: ...."

In June 1981, Keystone issued a summary annual report to the pension plan's participants, the members of the Union, as required by ERISA. In this report, Keystone revealed that in December 1980, on the advice of its accountants, it had applied to the Internal Revenue Service ("IRS") for a waiver of its 1979–1980 pension plan contribution. To obtain a temporary waiver of the ERISA annual minimum funding obligation from the IRS, the employer must demonstrate

"(1) The employer is operating at an economic loss,

(2) There is substantial unemployment or under-employment in the trade or business and in the industry concerned,

(3) The sales and profits of the industry concerned are depressed or declining and,

(4) It is reasonable to expect that the plan will be continued only if the waiver is granted."

29 U.S.C. § 1083(b). If the IRS grants the temporary waiver, the company in subsequent years must contribute, "the amount necessary to amortize each waived funding deficiency (within the meaning of section 1083(c) of this title) for each prior plan year in equal annual installments (until fully amortized) over a period of 15 plan years." *Id.* at 1082(b)(2)(C). The summary annual report to the pension plan participants issued by Keystone revealed that the Inter-

---

**1.** The Honorable William J. Jameson, Senior District Judge for the District of Montana, is sitting by designation.

nal Revenue Service had granted Keystone's request for a waiver of its annual contribution under ERISA based on evidence presented by Keystone alleging that it had suffered a net loss of almost $3.5 million for the fiscal year beginning on July 1, 1979, and a net loss of over $2.5 million in the following year, due to serious downturns in the industries to which it sold its products. Additionally, the IRS found that Keystone was experiencing great difficulty in maintaining sufficient working capital to prevent a technical default of its prime loan obligations to the Continental Illinois National Bank. However, the IRS concluded that Keystone would in all probability be able to recover from its present financial difficulties as a result of its modernization efforts and its program to reduce costs.

In September 1981, the Union filed grievances with an arbitrator pursuant to the Union's collective bargaining agreement with Keystone, alleging that Keystone had violated the annual funding provision of the pension agreement by failing to make its contribution to the plan for the 1979–1980 plan year. After the arbitrator held an evidentiary hearing and reviewed the parties' briefs, he issued an award in favor of the Union and ordered Keystone to pay $2,147,932 to the pension fund with interest at 8% per year from July 1, 1980, until paid. The parties became involved in a dispute as to when the award was due to be paid, after the issuance of the arbitrator's decision. The Union claimed that the award required the immediate payment of the full amount, while Keystone claimed that the award required full payment in conformity with the fifteen-year equal installment payment schedule, as set forth for in ERISA. As a result of this dispute over the interpretation of the arbitrator's award, the Union filed suit under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982), to have the district court enforce the arbitrator's award.

On June 16, 1983, the district court denied both the Union's and Keystone's motions for summary judgment without prejudice and remanded the case to the arbitrator for clarification of the language in the award. The arbitrator clarified his decision on July 5, 1983, explaining that Keystone was to pay the 1979–1980 plan year contribution immediately because Article VI, section 2 of the pension agreement specifically provided that: "The Company agrees to make contributions to the trust fund on an annual basis ...." Both parties renewed their motions for summary judgment to the district court, and Keystone argued that the court should not enforce the arbitrator's award because the award directly conflicted with and nullified the waiver provision of ERISA. On February 27, 1984, the district court granted the Union's motion for summary judgment and enforced the arbitrator's award.

On appeal, Keystone argues that the district court erred as a matter of law in enforcing the arbitrator's award because the award conflicts with the public policies embodied in ERISA. Keystone claims that the safeguards embodied in the waiver provision of ERISA cannot be overridden by a pension agreement because these safeguards were enacted for the benefit of the participants of the pension plan. Additionally, Keystone contends that compelling an employer to honor a contractual obligation to make pension plan contributions when the IRS has granted a waiver of the ERISA minimum funding requirements because of the dire financial status of the business would violate public policy because enforcement of the contract provision risks an unnecessary termination of the pension plan.

## II.

At the outset, we note that there were two sources of Keystone's annual funding obligation. Section 302 of ERISA (29 U.S.C. § 1082) provides:

"(1) Every employee pension benefit plan subject to this part shall satisfy the minimum funding standard (or the alternative minimum funding standard under section 1085 of this title) for any plan year to which this part applies. A plan

to which this part applies shall have satisfied the minimum funding standard for such plan for a plan year if as of the end of such plan year the plan does not have a cumulative funding deficiency."

The purpose of the ERISA minimum funding requirements is to insure that pension plans will accumulate sufficient assets within a reasonable time to pay promised benefits to covered employees when they retire. *See* H.R.Conf.Rep. No. 93–1280, 93d Cong., 2d Sess. 283, U.S.Code Cong. & Admin.News 1974, p. 4639, 1974–3 Cum. Bull. 415, 444. ERISA's funding standards are enforced under provisions of the Internal Revenue Code. 26 U.S.C. § 4971(a). If, at the end of a plan year, the employer has failed to make the minimum contributions necessary to meet the funding requirements of Section 302 of ERISA, § 4971 imposes a nondeductible, 5% excise tax on the amount of the accumulated funding deficiency. *Id.* If the funding deficiency is not corrected, an additional tax equal to 100% of the deficiency is imposed. *Id.* at § 4971(b). Neither the initial 5% excise tax nor the additional 100% tax is deductible for federal income tax purposes. *Id.* at § 275(a)(6).[2] Although the minimum funding standards were imposed by Congress to minimize the loss of benefits to participants in inadequately funded plans, Congress recognized that enforcement of the ERISA minimum funding requirement could cause financially troubled employers to terminate their plans rather than subject themselves to the funding taxes imposed on funding deficiencies. *See* H.R.Rep. No. 93–779, 93d Cong., 2d Sess. 80, 1974–3 Cum.Bull. 244, 323. To avoid plan terminations, Congress authorized the IRS to temporarily waive the minimum funding requirement in cases of economic hardship. 29 U.S.C. § 1083(a).

In addition to the ERISA minimum funding obligation, an employer's annual contribution obligation may be contained in a collective bargaining agreement. 29 U.S.C. § 186(c)(5–8). Article VI § 2 of the Pension Agreement between Keystone and the Union recites in pertinent part: "The Company agrees to make contributions to the trust fund on an annual basis during the terms of the Agreement."

■■■■■ Keystone argues that § 303 of ERISA, the ERISA minimum funding waiver provision, limits Keystone's and the Union's rights to contract during the collective bargaining process for continued annual funding of the pension plan when the IRS has granted a waiver of the ERISA minimum funding requirement. According to Keystone, the parties' liberty to contract is limited by ERISA because a contractual promise to continue annual funding of the pension plan even though the IRS has temporarily waived the ERISA minimum funding requirement would force the employer into financial ruin and jeopardize the pension plan. In addressing the issue of whether ERISA limits the parties' rights to contract in collective bargaining agreements, we note that ERISA "does not regulate the substantive content of welfare-benefit plans." *Metropolitan Life Ins. Co. v. Mass.,* —— U.S. ——, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985). *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In *Murphy v. Heppenstall Co.,* 635 F.2d 233 (3d Cir.1980), the Third Circuit addressed the question of whether 29 U.S.C. § 1362 and 1322, limiting the employer's liability to the Pension Benefit Guaranty Corporation "place a cap on, respectively, the employer's liability for pension benefits, and the employees' right to receive employer-funded benefits." *Id.* at 237. "The employer maintain[ed] the

---

**2.** When collective bargaining agreements are involved, the Internal Revenue Code provides:

> "the liability under section 4971 [imposing the funding tax] of each employer who is a party to the collective bargaining agreement shall be determined in a reasonable manner not inconsistent with regulations prescribed by the Secretary—

> (A) first on the basis of their respective delinquencies in meeting required employer contributions under the plan, and
> (B) then on the basis of their respective liability for contributions under the plan."
> *Id.* at 413(b)(6).

federally-insured pension benefits set out in Title IV of ERISA, 29 U.S.C. § 1301–81 afford[s] employees all the pension rights to which they are entitled," and that section 1362 and 1322, placing a cap on liability to the PBGC, evinced Congress intent to limit the beneficiaries pension rights. The court noted that the sections 1362 and 1322 "in no way address pension benefits directly recoverable from the employer." *Id.* at 237–38. Based upon not only the statutory language but also upon the Act's legislative history, as summarized in *Nachman Corp. v. PBGC,* 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980), the Third Circuit concluded that §§ 1362 and 1322 did "not limit the employer's direct contractual liability to employees," 635 F.2d at 237–38, and that its holding was "not inconsistent with the statutory scheme to permit employees to recover directly from the employer any additional benefits to which the employer has contractually obligated itself." *Id.* at 239. *See also In the Matter of M & M Transportation Co.,* 3 B.R. 722 (S.D.N.Y.1980); *In Re Alan Wood Steel Co.,* 5 B.R. 620 (Bkrtcy E.D.Pa.1978). Similar to the analogous situation faced by the Third Circuit in *Murphy,* we have failed to discover any language in the legislative history of section 303 that would limit the contractual obligation of Keystone to fund its pension plan pursuant to the negotiated collective bargaining agreement. In *Murphy,* the court further held that § 1144 of ERISA, the preemption section, preempts state law but does not supercede the federal common law of labor-management contracts. *Id.* at 237. Indeed, ERISA expressly provides that an employer's failure to make a pension plan contribution agreed upon in a collective bargaining agreement violates ERISA:

"Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agree-ment shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

29 U.S.C. § 1145.[3] Suits to enforce pension rights obtained under a collective bargaining agreement may be brought under ERISA, 29 U.S.C. § 1132, or under § 301 of the Labor-Management Relations Act, ("LMRA") 29 U.S.C. § 185. *Bugher v. Geightner,* 722 F.2d 1356, 1361 (7th Cir.1983) (Wood, J., concurring); *see e.g., Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). Our court has held that the ERISA enforcement section, § 1132, "was intended to supplement rather than supersede the rights existing under 29 U.S.C. § 185...." *Ind. State Council of Roofers v. Adams Roofing,* 753 F.2d 561, 563 (7th Cir.1985); *Bugher,* 722 F.2d at 1359, *see also Kaiser Steel,* 455 U.S. at 87, 102 S.Ct. at 861. Based upon not only the statutory language of ERISA sections 1132 and 1145 but also the cases addressing the relationship of ERISA to the LMRA, we hold that ERISA does not forbid parties to collectively bargain for obligations greater than, and separate from, the ERISA minimum funding obligations.

■ We now turn to the question of whether the arbitrator's award violated public policy. Keystone bases its public policy argument on the observation that the well-defined and dominant public policy embodied in ERISA is to protect plan participants from the unnecessary termination of their pension plans. Keystone reasons that because the IRS found that it faced a "substantial business hardship," the arbitrator's refusal to permit it to rely on the payment schedule outlined in ERISA's waiver provision jeopardized the continued existence of Keystone's pension plan, to the serious detriment of the plan participants. Keystone concludes that because the arbitrator jeopardized the continued ex-

---

**3.** The Supreme Court has interpreted the statutory phrase "to the extent not inconsistent with law" as meaning that courts will not enforce collectively-bargained payment obligations that would "lead to" situations condemned by law, or that would allow a party to "reap the fruits" of illegal collective-bargaining provisions, such as violations of the Labor Management Relations Act, the antitrust laws, or the National Labor Relations Act.

istence of the pension plan in refusing to allow Keystone to rely on the payment schedule outlined in the ERISA waiver provision, he violated public policy.

Initially, we note that an examination not only of the legislative history of ERISA but also the statutory language fails to reveal that Congress intended to authorize the IRS to relieve an employer of its contractual obligation to contribute to its employees' pension plan. The statute provides that the Secretary of the Treasury "may waive *the requirements of section 1082(a) of this title*" (emphasis added); the statute fails to specify that the Secretary may waive contractual funding requirements contained in pension agreements between private parties. Moreover, the application for the waiver is made by the employer and the statute fails to provide for giving notice or an opportunity to be heard to the beneficiaries. *See* Rev.Proc. 83–41, 1983–1 Cum.Bull. 775. The Justice Department argues, and we agree, that there are two reasons for granting waivers on an *ex parte* basis without providing advance notice to plan participants. First, since the employer's waiver application contains tax return information, disclosure of the application would violate Section 6103 of the Internal Revenue Code prohibiting the disclosure of tax return information. Secondly, involvement of the plan participants or their bargaining representative in the waiver process would be administratively cumbersome. The statute requires the Secretary to consider whether:

"(1) The employer is operating at an economic loss,

(2) There is substantial unemployment or underemployment in the trade or business and in the industry concerned,

(3) The sales and profits of the industry concerned are depressed or declining and,

(4) It is reasonable to expect that the plan will be continued only if the waiver is granted."

29 U.S.C. § 1083(b). However, the statute does not provide beneficiaries with an opportunity to present evidence on these is-sues, and furthermore, the Secretary is not required to provide a written record in support of his decision. Moreover, it is apparent that Keystone's reasoning rests on the assumption that the IRS determination was necessarily fair and accurate; on the other hand, if the IRS decision to waive the ERISA minimum funding requirement was in fact, inaccurate, the arbitrator did not violate public policy by requiring Keystone to make the annual contributions set forth in the Pension Agreement. The Justice Department argues, and we agree, that enforcement of an employer's contractual funding obligations is not in violation of any policy provision of ERISA. On the basis of this statutory scheme, we reject Keystone's argument that the IRS' determination of the employer's obligations under ERISA should be determinative of the contractual rights of private parties since the statute is structured to temporarily waive only the statutorily created right to minimum pension funding.

The Union also raises two persuasive constitutional objections, based upon their right to due process and on separation of powers, to Keystone's contention that the IRS' decision to waive the ERISA minimum funding requirements nullifies their contractual right to an annual contribution under the pension agreement. Initially, we address the Union's due process argument that Keystone's interpretation of ERISA (that an IRS waiver of the ERISA minimum funding requirement also acts as a waiver of the contractual obligation to annual funding) violates their due process rights to notice and to be heard. Because the statute does not require the IRS to conduct a formal trial-type hearing in determining whether to grant a waiver of the ERISA minimum funding requirements, the decision whether to grant the waiver is more properly classified as an "informal" agency action. Although the applicable statutes and regulations may permit an agency to act informally, the agency's informal temporary waiver determination procedure must still provide due process to those whose rights will be adversely affected by its decision in order to

comply with the Fifth Amendment's mandate that a person must not be deprived of his "liberty, or property, without due process of law." *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In addressing a due process challenge to an informal agency decision based on the deprivation of a property interest, the court must ascertain:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedurals requirement would entail."

*Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. Thus, to determine whether Keystone's interpretation of the Act (arguing that the IRS decision to allow a waiver of the ERISA annual minimum funding requirement also waives the contractual minimum funding requirement) violates due process, we examine the IRS waiver procedure to ascertain the danger of an erroneous deprivation of the contractual right to minimum funding; the probable value of additional or substitute safeguards; and, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. In essence, the statute requires the Secretary of the Treasury to make two separate and distinct evidentiary determinations before granting a waiver of the ERISA minimum funding requirement: (1) the employer is facing a substantial business hardship and (2) that granting a waiver of the ERISA minimum funding requirements would be in the interest of the plan participants. *See*, 29 U.S.C. § 1083(b). If the IRS grants the waiver, the company must, in subsequent years, contribute, "the amount necessary to amortize each waived funding deficiency (within the meaning of section 1083(c) of this title) for each prior plan year in equal annual installments (until fully amortized) over a period of 15 plan years." *Id.* at 1082(b)(2)(C). In the instant case, the IRS' grant of the temporary waiver of the ERISA minimum funding requirement stated:

"The information submitted with the request and at an informal conference shows that the Company has suffered a substantial loss for the Company's fiscal year ended June 30, 1980, for a variety of reasons, most of which relate to serious downturns in the industries to which it . sells its products, including the automotive industry, housing and agriculture. Further, the Company continues to experience a serious problem maintaining a sufficient amount of working capital to prevent technical default under its prime loan obligations.

The Company has nevertheless managed to continue its modernization program so that it can be positioned to take best advantage of turnarounds in the industry it serves. The Company has also pared costs and has reduced future benefit accruals under one of the largest pension plans it maintains. For these reasons, we believe the Company can recover from its present hardship and have therefore granted these waivers."

An analysis of these reasons reveals that although some of the facts on which the IRS relied may not be subject to serious dispute (*i.e.,*—"the downturns in the industries to which it sells its products"), other factual findings could be the subject of vigorous debate (*i.e.,*—whether the company "has ... managed to continue its modernization program so that it can be positioned to take best advantage of turnarounds in the industry it serves" and whether "the Company can recover from its present hardship"). Moreover, under Keystone's approach the government's interest in making a fair and accurate determination of whether to grant a temporary waiver of the *ERISA* minimum funding requirement would be expanded to include an interest in making a fair and accurate determination of whether to grant a tempo-

rary waiver of the *contract's* minimum funding requirement. We hold that the beneficiaries' contract rights cannot be nullified by an IRS ERISA minimum funding temporary waiver determination because the IRS ERISA minimum funding waiver procedure fails to grant the beneficiaries (who have a contractual right to an annual contribution from the company) the right to notice and an opportunity to be heard.

As a second constitutional objection to Keystone's public policy argument, the Union directs our attention to the following passage in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982):

"[A] matter of public rights must at a minimum arise 'between the government and others.' ... In contrast, 'the liability of one individual to another under the law as defined' ... is a matter of private rights. Our precedents clearly establish that *only* controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination.... Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power."

458 U.S. at 69–70, 102 S.Ct. at 2870–71 (emphasis in original) (citations omitted). The plurality in the *Marathon* decision held that the principle of separation of powers embodied in Article III of the Constitution permits legislative courts (non-Article III courts) in three situations: (1) territorial courts; (2) courts-marshals; (3) legislative courts and agencies established to enforce "public rights." The plurality defined "public rights" as "matters arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments.'" *Marathon*, 458 U.S. at 67–68, 102 S.Ct. at 2869–70. The Supreme Court stated that no case arising between two individuals could be characterized as one of public rights. *Id.* at 68–72, 102 S.Ct. at 2869–72. Although the *Marathon* decision addressed the constitutionality of bankruptcy courts,

courts have applied its reasoning to administrative agencies, *see, e.g., Kalaris v. Donovan,* 697 F.2d 376 (D.C.Cir.1983), and commentators agree that the decision may be applied to administrative agencies if an agency adjudication attempts to resolve private rights. See, e.g., Forward—The Supreme Court, 1981 Term, 96 Harv.L.Rev. 257–68 (1982); Redish, Legislative Courts, Administrative Agencies, and the *Northern Pipeline* Case Decision, 1983 Duke L.J. 197 (1983). An "'adjudication' means agency process for the formulation of an order." 5 U.S.C. § 551(7). An "'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule-making but including licensing." *Id.* at (6). Because the IRS' grant of a temporary waiver of the ERISA minimum funding requirement is "a final disposition of an agency matter other than rule making," it is an adjudication; the IRS acts in a judicial function when determining whether to grant a waiver of the ERISA minimum funding requirement. Under Keystone's argument, the IRS' decision to grant a temporary waiver of the ERISA minimum funding requirement nullifies the beneficiaries' contract right to an annual contribution because an attempt to enforce the contract right would be violative of public policy; in effect, under Keystone's public policy argument, the IRS determines contract rights between private parties, *i.e.,* whether an attempt to enforce the contract right to an annual contribution would violate public policy. Thus, we reject Keystone's public policy argument because it would improperly place the IRS into the role of impermissibly wielding Article III power in determining the contract rights between private parties.

We hold that the relationship between the IRS' procedure for waiving the ERISA minimum funding requirement and the collective bargaining agreement is analogous to the relationship between the Equal Employment Opportunity Commission and collective bargaining agreements:

"Absent a judicial determination, the commission [EEOC], not to mention the Company, cannot alter the collective bargaining agreement without the Union's consent. Permitting such a result would undermine the federal labor policy that parties to a collective bargaining agreement must have reasonable assurance that their contract will be honored."

*W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 2186, 76 L.Ed.2d 298 (1983); *see also,* 126 Cong.Rec., at 20180 (remarks of Sen. Williams) ("It is essential to the financial health of multiemployer plans that they and their actuaries be able to rely on an employer's contribution promises. [P]lan participants for whom the employer promises to make pension contributions to the plan in exchange for their labor are entitled to rely on their employer's promises."). The Supreme Court's ruling in the well-reasoned *Grace* decision mandates that neither the company nor the IRS could alter the collective bargaining agreement without the beneficiaries' consent.

The decision of the district court is AF-FIRMED.