## D.J. LEE, M.D., INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 140-87, 141-87.     Filed February 7, 1989.

*Edward M. Janis,* for the petitioner.
*Carol A. Szczepanik,* for the respondent.

WHALEN, *Judge:* Respondent determined that two pension plans sponsored by petitioner failed to satisfy the minimum funding standards prescribed by section 412[1] for their respective plan years ending September 30, 1982. Accordingly, he determined deficiencies in petitioner's Federal excise tax under section 4971(a) for petitioner's fiscal year ending on that date. In the case of petitioner's defined benefit pension plan (docket No. 140-87), the deficiency was $3,470, based upon an accumulated funding deficiency in the amount of $69,393. In the case of petitioner's money purchase pension plan (docket No. 141-87), the deficiency was $584, based upon an accumulated funding deficiency in the amount of $11,680. Both cases were consolidated on the joint motion of the parties.

There are two issues for decision: whether petitioner's plans satisfied the minimum funding standards of section 412 for the year in issue, and if not, whether the excise tax imposed by section 4971(a) applies in the case of an

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

unintentional failure to meet the minimum funding standards.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and associated exhibits are incorporated herein by this reference.

Petitioner, D.J. Lee, M.D., Inc., an Ohio corporation, maintained its principal place of business in Cleveland, Ohio, at the time it filed both petitions. It reported its income for Federal income tax purposes using a fiscal year ending on September 30. The record does not state, however, whether petitioner employed a cash or accrual basis accounting method. Dong J. Lee, a medical doctor (Dr. Lee), is, and was at all relevant times, petitioner's president.

Petitioner established the D.J. Lee, M.D., Inc. Employees' Defined Benefit Pension Plan (defined benefit plan) on October 1, 1977, and 1 year later established the D.J. Lee, M.D., Inc. Employees' Money Purchase Pension Plan (money purchase plan). During petitioner's fiscal year ending September 30, 1982, both pension plans: (1) Were in effect; (2) maintained plan years ending on September 30; (3) were funded by trusts of which Dr. Lee served as trustee; and (4) were qualified under section 401(a).

The contribution necessary to fund the defined benefit plan for plan year ending September 30, 1982, was $69,393. Similarly, $11,680 was necessary to fund the money purchase plan for its plan year ending September 30, 1982. Petitioner was the employer responsible for contributing to the two plans. Normally, petitioner funded each plan by depositing its contribution for the year in separate bank accounts maintained with Shearson/American Express, Inc., in the name of the defined benefit plan, account No. 711-13970, and of the money purchase plan, account No. 711-14220 (the plan bank accounts).

Dr. Lee, the trustee of both plans, is approximately 59 years old. Born in Korea, he immigrated to the United States some time ago, but still has difficulty with the English language. He does not understand pension plans, or their underlying actuarial and tax concepts.

Dr. Lee retained a pension consulting firm (the consultants) to advise him, and relied heavily on the consultants' advice in the performance of his duties relating to the two plans. The consultants would instruct Dr. Lee as to the recommended amounts and dates of plan contributions, and he would faithfully execute their instructions. Consequently, it appears that petitioner fully funded both plans in a timely fashion from their inception until the year in issue.

Over a period of time, Dr. Lee became dissatisfied with the consultants' practice of calling upon petitioner to make substantial contributions to the plans at the last moment. Therefore, on December 20, 1982, approximately 3 months after the end of the plan year in question, he caused petitioner to establish an interest-bearing "Ohio Savings Ready Money II Checking Account," account No. 5700-1000 (the extra checking account), with Ohio Savings Association in the name of D.J. Lee, M.D., Inc. Petitioner, acting on Dr. Lee's initiative rather than the consultants' advice, from time to time deposited various sums into the extra checking account. By June 8, 1983, the extra checking account contained $109,266.86, and thereafter maintained a balance sufficient to cover payment of the contributions necessary to fund both plans for their plan year ending September 30, 1982. From December 20, 1982, until August 8, 1983, petitioner realized $5,063.24 in interest income on the funds in the extra checking account.

Dr. Lee conceived of the extra checking account as a device to facilitate the transfer of any necessary funds into the plan bank accounts at the time the consultants told petitioner to make its annual plan contributions. Petitioner did not regularly use the extra checking account in the conduct of its daily business, for which purpose it maintained separate corporate checking and savings accounts. The extra checking account, however, was in petitioner's corporate name, rather than in the pension plans' names. Its funds were readily available to petitioner for any purpose. In fact, on January 18, 1983, petitioner withdrew $2,000 from the account for purposes unrelated to the plans' funding. No further withdrawals from the extra checking account were made until July 15, 1983, as described below.

On April 20, 1983, petitioner applied for an extension of time in which to file the plans' annual returns for the year in issue. Thereafter, acting on the consultants' advice that the contribution to each plan for the plan year ending September 30, 1982, was due by July 15, 1983, petitioner made the contributions by depositing a check dated July 13, 1983, into each plan bank account, one in the amount of $69,638 for the defined benefit plan, and one in the amount of $11,680 for the money purchase plan. Both checks were drawn on the extra checking account and were paid on July 15, 1983. Petitioner contemporaneously filed with the Cincinnati Service Center an annual return for each plan for the year in issue on Form 5500-R, Registration Statement of Employee Benefit Plan. On each return, petitioner acknowledged that the plan had "experienced a funding deficiency for the plan year," and, on an attached statement, requested respondent to waive the excise tax attributable to the deficiency on the grounds that Dr. Lee's accountant erroneously believed that an extension of time in which to file Form 5500-R also extended the time period for making plan contributions.[2] Petitioner has not filed Form 5330, Return of Initial Excise Taxes Related to Pension and Profit Sharing Plans, for the year in issue.

## OPINION

The minimum funding standards of section 412 were enacted by Congress to assure that qualified plans would accumulate sufficient assets within a reasonable time to pay benefits to covered employees when they retire. H. Rept. 93-779 (1974), 1974-3 C.B. 244, 316. Congress was concerned by evidence which suggested that a significant number of qualified pension plans were not adequately funded and were not accumulating sufficient assets to pay benefits to covered employees in the future. H. Rept. 93-779, *supra,* 1974-3 C.B. at 315. Accordingly, Congress promulgated the minimum funding rules in section 412 to place qualified plans on an actuarially sound funding procedure and,

---

[2]Sec. 412(d) provides procedures under which an employer may apply for waiver of the minimum fund standards on the grounds of business hardship. The parties have not raised the question whether a valid waiver under sec. 412(d) existed, and we do not consider that issue here.

generally, to require not only the current funding of normal costs but also to require the amortization of past service liabilities, experience losses, losses resulting from changes in actuarial assumptions, and the like. H. Rept. 93-533 (1974), 1974-3 C.B. 210, 223; H. Rept. 93-779, *supra,* 1974-3 C.B. at 315-317. The basic principle behind the minimum funding standards is that pension plans must be funded in some regular and current fashion. H. Rept. 93-533, *supra,* 1974-3 C.B. at 223. Section 412 seeks to assure that annual contributions will be made by employers to their pension plans in an amount sufficient to satisfy the plans' projected costs and liabilities. H. Rept. 93-779, *supra,* 1974-3 C.B. at 314-318.

In effect, section 412 requires an annual comparison of pension plan costs and liabilities with employer contributions through an accounting device called the "funding standard account." An employer must establish and maintain a separate funding standard account for each qualified pension plan, with certain exceptions not relevant here. Sec. 412(b)(1). The account acts as a ledger on which the plan's costs and liabilities are balanced with contributions and other adjustments. "Charges" to the account consist, generally, of the normal cost of the plan for the year, and the amortization of certain costs and liabilities, including past service liabilities, net experience losses, and net losses from changes in actuarial assumptions. Sec. 412(b)(2). "Credits" to the account consist, generally, of employer contributions for the year, and the amortization of certain adjustments, such as decreases in past service liabilities, net experience gains, net gains from changes in actuarial assumptions, and waived funding deficiencies. Sec. 412(b)(3).

At the end of each plan year, if the employer has met its minimum funding obligations, the aggregate charges to the account, determined on a cumulative basis, should not exceed the aggregate credits. Any excess is referred to as an "accumulated funding deficiency," and means in effect that the plan is underfunded at that time. Sec. 412(a). If there is an accumulated funding deficiency for a plan year computed as of the end of such plan year, then the employer is subject to excise tax under section 4971(a). Secs. 412(a) and 4971(a).

In the case before us, there is no dispute that for the plan year ending September 30, 1982, charges amounting to $69,393 in the case of the defined benefit plan, and $11,680 in the case of the money purchase plan, were properly made to the funding standard account of each plan. The issue is whether these charges were offset by credits in the form of timely employer contributions for the year.

With regard to employer contributions, "the funding standard account shall be credited with * * * the amount *considered contributed* by the employer to or under the plan for the plan year." (Emphasis supplied.) Sec. 412(b)(3)(A). This amount includes not only contributions made during the plan year, but also, under section 412(c)(10), certain contributions made after the close of a plan year. Section 412(c)(10), as in effect for the year in issue, provided:

(10) TIME WHEN CERTAIN CONTRIBUTIONS DEEMED MADE.—For purposes of this section any contributions for a plan year *made* by an employer after the last day of such plan year, but not later than two and one-half months after such day, shall be deemed to have been *made* on such last day. For purposes of this paragraph, such two and one-half month period may be extended for not more than six months under regulations prescribed by the Secretary. [Emphasis supplied.]

Under this provision, an employer's contributions are credited to the plan's funding standard account for a particular plan year, if the contributions are "made" within 2½ months after the last day of that plan year or within an additional 6 months if allowed by regulation. Sec. 412(c)(10). Respondent's regulations automatically extended this grace period to the full 8½ months. Sec. 11.412(c)-12(b), Temporary Income Tax Regs., 41 Fed. Reg. 46597 (1976).[3]

These rules required petitioner to have "made" its contributions to the plans by June 15, 1983, in order to be considered timely with respect to the plan year ending September 30, 1982. Petitioner concedes that it failed to contribute to the plan bank accounts until July 15, 1983,

---

[3]Effective for years beginning after Dec. 31, 1987, sec. 412(c)(10)(A) extends the grace period for employer contributions to 8½ months after the close of the plan year for employers not maintaining multiemployer plans as defined in sec. 414(f)(1). Sec. 9304(a)(1), Omnibus Budget Reconciliation Act of 1987 (OBRA '87), Pub. L. 100-203, 101 Stat. 1330-343. For plan years beginning after 1988, subject to a 4-year phasein, sec. 412(m) requires employers to pay their plan contributions in quarterly installments. Sec. 9304(b)(1), OBRA '87, 101 Stat. 1330-1344.

when the checks described above were deposited into the accounts.

Petitioner contends that it should, nevertheless, receive credit for timely employer contributions by reason of the fact that the funds paid to the plan bank accounts came from the extra checking account, and had been segregated in that account prior to the prescribed deadline. Petitioner claims that the extra checking account constituted a dedicated account, in which funds exclusively committed to use as future plan contributions were segregated in advance of the deadline for making those contributions, in order to facilitate their subsequent transfer to the plans once the consultants had calculated the precise amount needed. Petitioner argues that its plan contributions should therefore be considered "made" when it deposited funds sufficient to satisfy the minimum funding standards into the extra checking account prior to June 15, 1983, rather than when it transferred the two checks from the extra checking account to the plan bank accounts. We disagree.

It is clear that before an amount can be "considered contributed by the employer to or under the plan for the plan year" for purposes of sections 412(b)(3)(A) and 412(c)(10), an employer must do more than what petitioner did. Although petitioner had set aside sufficient funds in its extra checking account from which it could pay the plan contributions, it did not actually part with any of these funds within the required time. The extra checking account was established in petitioner's name, rather than in the name of the plans or their trusts, and petitioner's creditors could reach the funds in the account to satisfy any debts owed them. Petitioner, as the account owner, retained complete control over the funds in the account and could withdraw them for its own purposes at any time. Indeed, on January 18, 1983, petitioner withdrew $2,000 for reasons unrelated to the funding of the plans. Furthermore, petitioner—not the plans or their trusts—realized interest income on all of the funds in the account. After the June 15, 1983, deadline, some of this interest was earned on the very funds ultimately contributed to the plans.

Through the end of June 15, 1983, the last day of the grace period under section 412(c)(10) for the plan year in

issue, petitioner possessed all incidents of ownership over the funds in the extra checking account. Petitioner has not shown that its deposit of funds into the extra checking account placed the funds beyond its own direct control, or removed them from the reach of its corporate creditors, much less irrevocably set them aside for the exclusive benefit of the plans. Up to that time, petitioner could have withdrawn the funds, become insolvent, or otherwise been prevented by the vicissitudes of business life from transferring the contributions to the plan accounts.

The issue in this case is similar to the issue whether timely employer contributions have been made for purposes of the income tax deduction provided employers under section 404(a). In that context, we have long held that to qualify for the deduction, an employer's contribution must have actually been paid, in the sense of an actual outlay of cash or property, prior to the statutory deadline for making the contribution set forth in section 404(a)(6). For example, an employer's contribution is untimely if contingent upon an event within the control of the employer which does not lapse by the end of the statutory deadline. *Surface Combustion Corp. v. Commissioner,* 9 T.C. 631, 655 (1947), affd. 181 F.2d 444 (6th Cir. 1950); *Wilcox Investment Co. v. Commissioner,* 3 T.C. 458 (1944). Nor does mere accrual on an employer's books of its liability for a plan contribution constitute "payment" of the contribution for purposes of section 404(a). *Gillis v. Commissioner,* 63 T.C. 11 (1974). Similarly, an employer's delivery of a signed check to its corporate officer, who is also a plan trustee, does not amount to "payment" under section 404(a)(6) if the officer/trustee retains the undeposited check until after the statutory deadline. *Walter Wilger Tire Co. v. Commissioner,* T.C. Memo. 1979-66. And, an employer fails to make a timely contribution to its pension plan for purposes of section 404(a) by merely designating on its books that a portion of a certificate of deposit in the face amount of $300,000 would be used to satisfy its accrued liability to the plan in the amount of $65,124. *Rollar Homes, Inc. v. Commissioner,* T.C. Memo. 1987-166.

The above decisions reflect a so-called objective outlay-of-assets test, under which all taxpayers, regardless of their

method of accounting, must pay out cash or its equivalent within the statutory deadline in order to qualify for the section 404(a) deduction. See *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 579 (1977). We are unaware of any reason why the same test should not be employed in connection with section 412. In any event, the clear legislative intent behind section 412 is to require an employer to do more than merely segregate funds in a bank account prior to the expiration of the section 412 grace period.

Petitioner's informal designation of the extra checking account as the fund from which it would make plan contributions amounts to nothing more than its good-faith intention to contribute to the plans when so instructed by the consultants. We do not doubt the good faith of petitioner or Dr. Lee. Good faith, however, is immaterial to section 412 for the same reasons it is immaterial to section 404:

we cannot ignore the plain language of the statute or the purposes it was designed to serve. Congress has hedged deductions for deferred compensation with a host of requirements which are designed to assure, as a condition to deductibility, that the funds are irrevocably set aside for the employee-beneficiaries' benefit within prescribed periods of time. Otherwise, the payments might never be made in cases of insolvency, bankruptcy, or other unforeseen conditions. The good-faith intentions of petitioners in this case ultimately to make the payments are not in dispute. But the statutory requirement is not conditioned on good intentions. The statute prescribes specific requirements which must be met if the deduction is to be allowed.  *.* * *  [*Gillis v. Commissioner, supra* at 17.]

For the above reasons, petitioner is not entitled to credit in either funding standard account for an employer contribution made by the June 15, 1983, deadline. This Court has no authority to prescribe otherwise. Therefore, each plan had an accumulated funding deficiency for the year in issue.

Turning to the excise tax issue, section 4971(a) imposes an automatic excise tax on an employer maintaining a plan with an accumulated funding deficiency,[4] computed as a

---

[4]For purposes of sec. 4971, sec. 4971(c)(1) defines the term "accumulated funding deficiency" by reference to the definition set forth by sec. 412(a) in connection with the minimum funding standards.

percentage of the deficiency. Section 4971(a), as in effect during the year in issue, provided:

SEC. 4971(a). INITIAL TAX.—For each taxable year of an employer who maintains a plan to which section 412 applies, there is hereby imposed a tax of 5 percent[5] under the plan, determined as of the end of the plan year ending with or within such taxable year. The tax imposed by this subsection shall be paid by the employer responsible for contributing to or under the plan the amount described in section 412(b)(3)(A).

The purpose of section 4971(a) is to enforce the minimum funding standards and assure that employers timely contribute sufficient funds to meet their plans' benefit obligations. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Keystone Consolidated Industries, Inc.*, 793 F.2d 810, 813 (7th Cir. 1986). Through the use of mandatory rather than discretionary language, the statute requires imposition of the tax whenever a plan contains an accumulated funding deficiency as of the end of its plan year. Because the plans in issue contained accumulated funding deficiencies as of the end of their plan years, petitioner is automatically subject to the excise tax.

Nevertheless, petitioner claims relief from imposition of the excise tax on the grounds that it, relying on the consultants' advice, made the transfers from the extra checking account to the plan bank accounts on July 15, 1983, in the good-faith belief that these transfers constituted timely employer contributions. Petitioner argues that inadvertence excuses imposition of the tax, and that Congress intended section 4971(a) to penalize only those employers which make a conscious, intentional, or willful decision that the cost of not complying with the minimum funding standards is less than the cost of fully funding the plan in a timely manner. We disagree for the following reasons.

First, nothing in the statute itself, the associated regulations and legislative history, or any judicial interpretation of the statute, supports petitioner's contention that intent to violate section 412 is a prerequisite to imposition of the

---

[5]Along with other changes in the statute not relevant here, OBRA '87 increased the excise tax rate to 10 percent, effective for plan years beginning after 1988. Sec. 9304(c)(1), OBRA '87, 101 Stat. 1330-1347.

initial tax under section 4971(a) or that inadvertence excuses failure to fund the plan. As the sole authority for its position, petitioner cites the following passages of legislative history:

*Enforcement.*—The sanctions under present law on the failure to meet the minimum funding requirements appear to have little effect on an employer's decision to fund a plan at the required minimum levels. *To resolve this problem, the bill imposes an excise tax on the employer if he fails to fund the plan at the minimum required amounts (only if a waiver has not been obtained).* [H. Rept. 93-779, 1974-3 C.B. at 339. Emphasis supplied.]

The committee bill also provides new and more effective penalties where employers fail to meet the funding standards. In the past, an attempt has been made to enforce the relatively weak funding standards existing under present law by providing for immediate vesting of the employees' rights, to the extent funded, under plans which do not meet these standards. This procedure, however, has proved to be defective since it does not directly penalize those responsible for the underfunding. For this reason, the committee bill places the obligation for funding and the penalty for underfunding on the person on whom it belongs—namely, the employer.

This is achieved by imposing an excise tax where the employer fails to meet the funding standards, which starts out at a relatively modest level and increases sharply where there is continued failure to make the indicated contributions. More specifically, if an employer fails to contribute sufficient amounts to meet the new funding requirements, he will be subject to a nondeductible excise tax of 5 percent per year on the amount of the underfunding for any year. If the employer fails to make up the underfunding by 90 days after original notification by the Internal Revenue Service (but with the Service in a position to grant extensions of time), then the employer is subject to a second level excise tax amounting to 100 percent of the underfunding. This determination by the Service is appealable to the Tax Court and no assessment may be made until after the end of the litigation. Since the employer remains liable for the contributions necessary to meet the funding standards even after the payment of the excise taxes, it is anticipated that few, if any, employers will willfully violate these standards. [S. Rept. 93-383 (1974), 1974-3 C.B. (Supp.) 80, 103-104.]

The material upon which petitioner relies does not support its position. In fact, the underlined sentence controverts petitioner's position by indicating that section 4971 imposes the tax on funding deficiencies whenever a waiver of the accumulated funding deficiency under section 412(d) is not obtained. Petitioner does not argue that it received such a waiver.

Moreover, the Conference Committee report states in unconditional language that the statute applies, without exception, to all unwaived accumulated funding deficiencies:

If there is an accumulated funding deficiency, an excise tax is to be imposed on the employer who is responsible for making contributions to the plan. [H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 445.]

Nowhere does the legislative history distinguish between intentional and unintentional accumulated funding deficiencies.

Second, the legislative history contemplates imposition of the tax in at least one situation where failure to meet the minimum funding standard may *not* necessarily result from the fault of the employer. The legislative history notes that the Internal Revenue Service may retroactively change the actuarial assumptions used in determining the minimum funding requirements under the plan if it determines that the initial assumptions used were substantially unreasonable in the aggregate. H. Rept. 93-779, *supra*, 1974-3 C.B. at 341. Generally, an employer's actuarial consultants prescribe such assumptions on the employer's behalf, and the employer has little or no expertise in reviewing the assumptions used in a plan. Nevertheless, the legislative history makes clear that the excise tax applies even when a funding deficiency occurs as a result of such changes. H. Rept. 93-779, *supra*, 1974-3 C.B. at 341.

There is no evidence that Congress intended to create an exception to section 4971(a) which would excuse an employer's unintentional or inadvertent failure to meet the minimum funding standards. Congress did not explicitly provide such an exception, and we cannot engraft one onto the statute through judicial fiat. Because petitioner's defined benefit and money purchase plans contained accumulated funding deficiencies under section 412 in the amounts determined by respondent, we sustain respondent's determination of petitioner's section 4971(a) excise tax liability.

Accordingly,

*Decisions will be entered for the respondent.*